**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL ACTION** |
| | **:** | |
| **v.** | **:** | **NO.  98-178** |
| | **:** | |
| **ROBERT EARL MARTIN** | **:** | |
| | **:** | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                    **July 13, 2020**

Even when an incarcerated person presents medical conditions which we consider constitute extraordinary and compelling reasons for compassionate release due to the risk of COVID-19 in our federal prisons, Congress requires we grant compassionate release only when we can find the released incarcerated person would not pose a danger to others and the community upon release.   We today evaluate whether a sixty-six-year-old man serving a life sentence following convictions for felony murder followed by two bank robberies using a sawed-off shotgun after lengthy prison sentences no longer poses a danger to others or the community.   The United States concedes his health presents extraordinary and compelling reasons for release, but his life of violent crime poses too great a risk of danger.   We commend the man for his clean disciplinary history for several years.  We appreciate his remorse for his violent crimes.  But we cannot find his release would not pose a danger to others and the community.  We cannot find his release is consistent with Congress's sentencing factors.  As an adult man after completing a prison sentence for felony murder, he twice played the principal role in robbing banks with shotguns the last two times courts released him from custody, including in the community where he now wishes to live.  We must deny his motion for compassionate release.

## I.       Facts

Robert Earl Martin moved to Philadelphia at age thirteen to live with a sister in a tough neighborhood.[1] He started using marijuana and PCP at age thirteen.[2] Mr. Martin admits his childhood lacked discipline and he joined a street gang. He often moved.[3] His grandmother helped to raise him.[4] Mr. Martin has a below average I.Q., and the Pennsylvania Department of Corrections testing placed his academic potential at a junior high school level.[5]

### *Mr. Martin's first conviction with violence.*

A Philadelphia bar owner refused to serve eighteen-year-old Mr. Martin and seven companions due to suspicious behavior on April 14, 1973.[6]  On their way out, the young group took a female patron's purse, leading to an altercation with her husband and others in the street outside the bar.[7] Mr. Martin fled with four others, and returned with a sawed-off shotgun.[8] Soon after, the police responded to a shotgun injury at the scene.[9]  The victim, a young woman, had a wound to her right side and later died in the hospital.[10] Mr. Martin claims one of the patrons swung a barstool at him, knocking the gun and causing it to fire.[11] The jury found Mr. Martin guilty of second-degree, or felony, murder.[12] In May 1974, the state court sentenced Mr. Martin to ten to twenty years and resentenced him on February 17, 1978 to seven to fourteen years. He received his General Equivalency Diploma in August 1978 while in the custody of the Pennsylvania Department of Corrections.[13]  The state court paroled Mr. Martin on June 5, 1980.[14]

After release on parole, Mr. Martin began residing with his common law wife, Karen Stith.[15] He and Ms. Stith have three children.[16] Mr. Martin also fathered three other children.[17] Mr. Martin reports in 1984 he began using one to two ounces of cocaine per week.[18] He continued at a high level of drug consumption into summer 1988.[19]

***Mr. Martin's second conviction with violence.***

In June 1988, Mr. Martin and two accomplices obtained a defective shotgun in Dudley, North Carolina and carried out a plan hatched by Mr. Martin to rob the Branch Banking and Trust Company in Goldsboro, North Carolina. One of the accomplices drove the getaway car, and a second man accompanied Mr. Martin inside the branch. Mr. Martin wielded the recently acquired, broken shotgun and announced they intended to rob the establishment while his partner took $3,690 in cash from the tellers.[20] Mr. Martin needed the money to support his $125 a day drug habit.[21]

Mr. Martin admitted he planned and carried out the robbery to support his drug habit.[22] Mr. Martin pled guilty to charges of armed bank robbery and possession of a firearm in relation to a crime of violence.[23] The United States District Court for the Eastern District of North Carolina sentenced him to ninety-six months.[24]

The Bureau of Prisons placed Mr. Martin in FCI Memphis.[25] Mr. Martin worked in various assignments and received good work assessments and only three minor disciplinary write-ups at FCI Memphis.[26] The Bureau of Prisons released Mr. Martin to the Greater Philadelphia Center for Community Corrections and placed him on supervised release on July 2, 1995.[27]

The halfway house reported Mr. Martin had a poor relationship with staff and shirked program rules.[28] He neglected to perform assigned work duties, refused to provide proof of his earnings as a barber, did not obey staff orders and did not attend meetings with his assigned case manager.[29] His probation officer referred him to the Belmont Treatment Outpatient Program in September 1995 but he failed to attend on a regular basis despite receiving numerous chances to attend and complete the substance abuse treatment program.[30] On the basis of noncompliance, the United States moved to revoke his supervised release. Judge Shapiro revoked his release on

January 31, 1996.[31]  Judge Shapiro sentenced him to another six months in prison but did not order a further period of supervised release.[32]

### Mr. Martin's third offense with violence leading to his present life sentence.

Less than two years after being released, Mr. Martin robbed a United Bank branch at on West Girard Avenue in Philadelphia on March 6, 1998.  Mr. Martin entered the bank alone carrying a sawed-off double-barreled shotgun.[33] He approached an unarmed female bank guard standing in the lobby and announced his intention to rob the bank.[34] He placed the sawed-off shotgun next to her head and demanded he be let into the teller area.[35] The guard pushed the shotgun barrel away from her head.[36] Mr. Martin then struck her in the head with the weapon and threatened to shoot her,[37] and he "told bank personnel in the teller area that he would blow the guard's head off if they did not let him in."[38]

A customer service representative buzzed Mr. Martin through locked doors into the teller area.[39] As he entered, Mr. Martin aimed the sawed-off shotgun at the bank guard as he entered.[40] Once inside the teller area, he shoved the bank guard onto the floor and opened a cash drawer, removing approximately $6,694.[41] Mr. Martin left the bank on foot, stuffing the money into his sweatshirt pockets as he left.[42]

In April 1998, our grand jury returned a two-count indictment against Mr. Martin.[43]  The grand jury charged Mr. Martin with armed bank robbery under 18 U.S.C. § 2113(d) and using and carrying a firearm during and in relation to the armed bank robbery under the Armed Career Criminal Act.[44]  The grand jury charged Mr. Martin with using a sawed-off double-barreled shotgun while robbing United Bank.[45]

Three bank employees testified at trial and positively identified him as the person who committed the bank robbery.[46]  On July 1, 1998, a jury found Mr. Martin guilty on both counts.[47]

The United States sought life imprisonment under section 3559(c),[48] known as the "three-strikes" statute, based on his 1974 conviction for second-degree murder and the 1988 conviction for carrying a firearm in relation to the bank robbery and armed bank robbery.

The Honorable Norma Shapiro rejected Mr. Martin's challenge to the application of the three-strikes statute and sentenced him to life imprisonment.[49] Mr. Martin has an uncomplicated disciplinary record for his current term of incarceration. He has been cited for minor behavioral issues in the past, but Mr. Martin has no infractions since 2004.[50] Mr. Martin has participated in a number of educational courses and certificate programs available to him.[51] He has also completed the Bureau of Prisons' drug education program, "and twice completed the UNICOR Chemical Pretreatment Training."[52]

Mr. Martin is now a sixty-six-year-old man suffering from chronic obstructive pulmonary disease (COPD), asthma, obesity, coronary artery disease, ischemic cardiomyopathy, a blood clot in his heart, hypertension, and high cholesterol.[53]

Doctors first diagnosed Mr. Martin with a heart condition in 1996 after he suffered a heart attack.[54] "Records from the St. Joseph's Hospital in Philadelphia listed that the subject was admitted on December 24, 1998 for a principal diagnosis of [scar tissue in the chest] with trapped lung and secondary diagnosis of pneumonia, cocaine abuse and coronary artery disease."[55]

Mr. Martin today suffers from ischemic cardiomyopathy, which decreases the heart's ability to pump blood.[56] Mr. Martin has a calcified blood clot in the left ventricle of his heart despite anticoagulant use.[57] To control his high blood pressure and high cholesterol, Mr. Martin takes losartan,[58] atorvastatin,[59] carvedilol,[60] apixaban,[61] and furosemide.[62]

Mr. Martin suffers from illnesses of his lungs, COPD and asthma, which he treats with "Spiriva daily [and] Symbicort a few times a week."[63] His respiratory and cardiac illnesses can at times make him feel short of breath.[64]

### Mr. Martin's moves pro se for compassionate release.

On March 30, 2020, Mr. Martin requested compassionate release from the Warden at FCI Butner Medium II.[65] The Warden denied his request on April 2, 2020.[66] Mr. Martin moved *pro se* for compassionate release on May 21, 2020, arguing his numerous medical issues place him at a high risk for poor outcomes or death from COVID-19, which constitutes an "extraordinary and compelling" reason for sentence reduction to time served. In his *pro se* motion, Mr. Martin also sought to again challenge our February 28, 2020 dismissal of his second or successive section 2255 petition, arguing we improperly applied the *Davis* decision to his case.[67]

Now represented by the Federal Defender, Mr. Martin seeks compassionate release from custody arguing his serious medical conditions coupled with the threat of contracting COVID-19 while in custody presents an extraordinary and compelling reason for sentence reduction. Mr. Martin argues he would not present a danger to the community if released because of his age, medical conditions, and rehabilitation from incarceration, and he argues releasing him would not undermine goals of criminal sentencing. If released, Mr. Martin states he is able to reside with a sister in Dudley, North Carolina, where she lives with her husband in a five-bedroom house.[68] Mr. Martin claims there is space for him to self-isolate and socially distance should he need to live there.[69] Three of his other siblings also live in the town of Dudley and would be able to assist him.[70]

## II.   Analysis

The United States opposes Mr. Martin's motion for compassionate release.

Congress allows us to reduce an incarcerated person's final sentence if we determine (1) the person exhausted his administrative requests to the Warden; (2) "extraordinary and compelling reasons" warrant a reduction; (3) reducing the final sentence is "consistent with any applicable policy statements issued by the Sentencing Commission"; and (4) the applicable sentencing factors under section 3553(a) warrant a reduction.[71] The United States does not dispute Mr. Martin meets the first and second requirements.[72]

The United States acknowledges Mr. Martin petitioned the Bureau of Prisons before filing this motion. The United States also concedes he presents an "extraordinary and compelling" reason for a reduced sentence because his heart and lung conditions place him at risk of death or serious outcomes if he contracts COVID-19.[73] But the United States maintains we cannot release Mr. Martin because he fails to satisfy the third and fourth requirements. The United States argues Mr. Martin is a danger to his community so his release would be inconsistent with applicable policy statements. The United States also argues the section 3553(a) factors do not warrant a reduction because early release would not reflect the seriousness of the offense, promote respect for the law, or provide just punishment for the offense. In response to the United States' memorandum opposing compassionate release, the Federal Defender reiterates Mr. Martin is unlikely to return to crime due to his advanced age and medical conditions and argue other courts have released violent criminals who present similar medical conditions.

We agree with the United States and cannot find Mr. Martin warrants compassionate release given he remains a danger to others and the community and the section 3553(a) factors do not warrant reducing his life sentence.

### A.    Mr. Martin is a danger to others and the community.

Mr. Martin argues he has shown by his conduct he is no longer a threat to public safety and granting him compassionate release would not endanger the community. The United States responds Mr. Martin's violent criminal history shows he would endanger the community if released. While we commend Mr. Martin's clean disciplinary history for over fifteen years, his repeated violent crimes do not allow us to find he is prepared to safely reenter the community.

The Commission's policy statement provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[74] "The factors listed in 3142(g) are largely duplicative of those in 3553(a)."[75] These factors assess the defendant's possible danger to the community, by considering "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."[76]

Sentencing judges reviewing the "nature and circumstances of the offense charged" focus on the violence of the crime and how long ago the crime took place.[77] We are reluctant to grant compassionate release if the movant committed a violent crime within a relatively short time period of moving for compassionate release.[78] And although some judges are more willing to grant a compassionate release motion if a movant's violent offense occurred further in their past,[79] judges have been reticent to release incarcerated persons with a history of life-threatening physical violence regardless of how long the individual has already been incarcerated.[80] For example, in *United States v. Wyatt*, Chief Judge Leonard T. Strand considered Mr. Wyatt's motion for

compassionate release when the movant suffered from "(1) severe coronary artery disease, (2) heart failure, (3) pleural effusion . . . (4) moderate carotid artery stenosis, (5) gallbladder polyps, (6) type two diabetes mellitus, (7) essential hypertension, (8) hyperlipidemia, . . . and (11) benign prostatic hyperplasia."[81] Chief Judge Strand denied Mr. Wyatt's motion and cited his history of armed robberies as direct evidence of his propensity towards violence, stating "Wyatt demonstrated that he was willing to commit violence when he threatened bank employees and brandished a weapon during his robberies. . . . [t]he fortuitous fact that his robberies did not result in any actual physical injuries is in no way mitigating."[82]  Mr. Wyatt had been incarcerated for over twenty years, but Judge Strand still found he posed a danger to the community because every time the system released him in the past he immediately returned to violent crime.[83]

Judges are disinclined to grant compassionate release to movants whose criminal history involves heightened levels of violence or homicide.[84]  For example, in *United States v. Walker*, Judge Robert N. Scola considered Mr. Walker's motion for compassionate release.[85] The court sentenced Mr. Walker in 2005 to a mandatory life term of imprisonment under the three-strikes statute following convictions for "multiple counts of carjacking and firearm offenses[.]" The sentencing court applied the three strike enhancement because it found two earlier robberies to be serious violent felonies.[86] Judge Scola held the movant's medical condition satisfied the "extraordinary and compelling" language of the compassionate release statute, but reasoned the requested "reduction, given the seriousness of his offenses and his criminal history, inappropriate at this time."[87]

Much like the incarcerated petitioner in *Wyatt*, Mr. Martin has been in prison for over twenty years, with his most recent offense being an armed robbery. Like Mr. Wyatt, Mr. Martin returned to violent crime repeatedly, brandishing weapons both to intimidate and assault his

victims. And much like the movant in *Walker*, Mr. Martin is serving a life-sentence for a "third-strike" crime of violence. Like Mr. Walker, Mr. Martin's offenses were violent robberies. Mr. Martin threatened bank tellers and assaulted an unarmed female security guard. This is a violent offense. We must also consider Mr. Martin's earlier convictions for second degree murder and an earlier armed robbery, which establish a behavioral pattern of disregard for the life and wellbeing of community members.

Mr. Martin cites distinguishable facts relied upon by courts granting compassionate release to an incarcerated person with a history of armed robbery.[88]   In *United States v. Morris*, Judge John C. Coughenor considered Mr. Morris's motion for compassionate release. The sentencing judge convicted Mr. Morris as an accomplice to three-armed bank robberies occurring over twenty years ago.[89]  Mr. Morris drove the getaway car, but because of his role as a conspirator, prosecutors charged him with armed bank robbery and a number of other crimes carried out by his accomplice. Mr. Morris's firearm counts "came with consecutive 10- and 25-year mandatory minimums," and "the Court sentenced Morris to 44 years in prison."[90] Judge Coughenor granted Mr. Morris's motion for compassionate release, finding the nature of his crime warranted sentence reduction as his accessory involvement and lack of other criminal history suggested he did not pose a danger to the community.[91]

Mr. Martin's case is distinguishable. Mr. Martin played an active role in his bank robberies: he procured and wielded a sawed-off shotgun on multiple occasions – one of which lead to the death of a young woman.  Martin planned his first bank robbery for himself and accomplices, and carried out the second robbery alone.

Mr. Martin asks we consider cases granting compassionate release to individuals currently serving life sentences. In *United States v. Williams*, the incarcerated person moving for

compassionate release had a history of armed bank robbery and brandishing a firearm during a crime of violence.[92]  The court sentenced Mr. Williams to life imprisonment under the three strike statute because of his role in earlier bank robberies.[93]  Judge M. Casey Rodgers granted release reasoning though Mr. Williams posed a risk to public safety "based on the nature and circumstances of his offenses," home confinement and otherwise strict terms of supervised release would lessen this risk.[94]

Unlike Judge Rodgers in *Williams*, we are unable to rely on the community protection supervised release and home confinement provide. Although Mr. Martin submits to the extent we find "he poses a minimal danger, the imposed term of supervised release mitigates that danger,"[95] Mr. Martin has previously been noncompliant when given opportunities for supervised release.  In his most recent period of supervised release he repeatedly tested positive for narcotics in his urine when he was reporting, and he disappeared in fall 1996.[96] Mr. Martin asks us to place him on supervised release in a town several states away, in an area where he committed serious crimes in the past. We cannot do so.

We next consider "the history and characteristics of the person"[97] and consider the incarcerated person's character beyond their criminal background. An incarcerated person's disciplinary record and involvement in prison programming bears on our assessment of the inmate's character.[98] We are mindful of the Supreme Court's direction in *Pepper v. United States*, "evidence of post sentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing."[99] We commend Mr. Martin for his excellent disciplinary record since 2004 and his extensive engagement with educational opportunities while incarcerated.

Other incarcerated persons warranting compassionate release have demonstrated a supportive family who will help their reentry into the community.[100] For instance, in *United States v. Loyd*, the movant's fatherhood to four children persuaded the court to grant compassionate release, stating his parenthood would reduce the likelihood he would return to crime.[101] Mr. Martin claims he has siblings willing to take him in, but he offers little evidence of the nature of their relationship, and he reports no relationship with any of his six children.

As a component of "the history and characteristics of the person,"[102] Mr. Martin argues his advanced age and health conditions make him less likely to commit crimes in the future.[103] We agree with the statistical truth of this assertion.[104] But Mr. Martin has not been deterred by serious medical conditions in the past. Mr. Martin was first diagnosed with a heart condition in 1996 after suffering a heart attack.[105] Two years later, "[r]ecords from the St. Joseph's Hospital in Philadelphia listed that the subject was admitted on December 24, 1998 for a principal diagnosis of [scar tissue in the chest] with trapped lung and secondary diagnosis of pneumonia, cocaine abuse and coronary artery disease."[106] Mr. Martin committed an armed robbery with a sawed-off shotgun less than a year later – when one might have expected him to be medically fragile and incapable – during which he physically assaulted bank employees and threatened their lives.

We also look to history of drug addiction when considering "the history and characteristics of the person."[107] Mr. Martin has an extensive history of narcotic use, at one point spending $125 a day on a cocaine habit. Mr. Martin has been noncompliant when given opportunities for supervised release in the past, disappearing for a period in fall 1996, and repeatedly testing positive for narcotics in his urine.[108]

We consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."[109] In *United States v. Esparza*, Judge B. Lynn Winmill

considered seventy-year-old Mr. Esparza's motion for compassionate release when he medically met the "extraordinary and compelling" language of section 3582.[110] Mr. Esparza's criminal history consisted primarily of armed drug trafficking charges.[111] While incarcerated, Mr. Esparza participated in drug treatment programs.[112] Judge Winmill denied the motion reasoning "[t]he Court cannot find that if Mr. Esparza[] is released he would not pose a danger to the community. . . [f]or that reason, and that reason alone, the Court reluctantly concludes that it cannot order Mr. Esparza's release."[113]

Much like the movant in *Esperanza*, Mr. Martin has a history of armed criminal charges. Mr. Martin committed several serious violent crimes – a second degree murder, and two armed robberies – with a sawed-off shotgun. Mr. Martin argues his murder charge and other offenses were so long ago he no longer poses a danger to the community. We are not convinced. Through the First Step Act, Congress gave sentencing courts the power and responsibility to reduce the sentences of those who can be safely released into the community without permission from the Bureau of Prisons.[114] Mr. Martin repeatedly engaged in acts of heightened violence which show a disregard for others. He does not seem to be reformed by his time in prison from his first two major convictions, and Congress directs us to weigh the safety of the community when considering motions for compassionate release.[115]

Mr. Martin has not shown us, based on our review of several factors, he would not pose a danger under section 3142(g) if granted compassionate release.

**B.     Reducing Mr. Martin's life sentence is not consistent with the section 3553(a) factors.**

Even if Mr. Martin could persuade us he does not pose a danger to others or the community, we would still need to find reducing his sentence is consistent with Congress's sentencing factors in section 3553(a).  We cannot do so.

13

We must "consider[] the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."[116] "Because section 3553(a) establishes factors to consider in initially imposing a sentence, not every factor applies here."[117] The applicable factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
. . . [and]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.][118]

We first look to the "nature and circumstances of the offense and the history and characteristics of the defendant." Mr. Martin is incarcerated for a three-strike life sentence imposed after committing a third crime of violence. He has an extensive violent criminal history, including a second-degree felony murder.  Although Mr. Martin has shown rehabilitation and good conduct while in custody, he has little to no employment history outside of prison and no reported relationship with his six children.

We consider "the need for the sentence imposed." As to this factor, Congress mandates: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)."[119] The United States argues releasing Mr. Martin would undermine the seriousness of the offense, fail to promote respect for the law, and would not be just punishment. Mr. Martin argues the three-strike statute is rarely used and he would be looking at a guideline range of 24.25 - 25.25 years if sentenced today.[120] We find this argument uncompelling,

14

as we are not evaluating a change in law argument, nor has Mr. Martin plead one. We agree with the United States and follow other courts denying compassionate release to a movant in part because they have a history of serious violent offenses.[121]

Mr. Martin has historically shown an inability to be deterred from criminal conduct. He repeatedly wielded deadly weapons and harmed members of the Pennsylvania and North Carolina communities in which he lived.[122] As discussed above, we find Mr. Martin still poses a danger to his community despite his age and medical conditions.[123] And we find no good argument to find he would not receive "educational or vocational training, medical care, or other correctional treatment" in prison.

We consider potential sentence disparities between Mr. Martin and defendants with similar records who have been found guilty of similar conduct. Allowing Mr. Martin to serve out his sentence would not create an unwarranted sentence disparity between himself and other violent career criminals sentenced under the same statute.

III.    **Conclusion**

In designing a system of compassionate release in the First Step Act, Congress decided persons incarcerated in federal prisons must be able to petition the federal courts, and not just the Bureau of Prisons, for compassionate release. Congress requires the incarcerated person present "extraordinary and compelling" reasons for a sentence reduction and then requires us to determine whether the released incarcerated person would be a danger to his community if released, and to weigh if a reduction is warranted under the section 3553(a) factors.

The United States concedes Mr. Martin presents an extraordinary and compelling reason for his release, requiring we only consider Mr. Martin's danger to his community and the section 3553(a) factors before ruling on his release. He has not met his burden on either of these

requirements as of today. Mr. Martin's violent criminal history, including twice committing violent crimes after serving long sentences, mandates against releasing him again. We deny Mr. Martin's motion finding he would endanger his community if released and the section 3553(a) factors weigh against a sentence reduction.

---

[1] Presentence Investigation Report (PSR) at ¶ 38.

[2] *Id.* at ¶ 48.

[3] *Id.*

[4] *Id.* at ¶ 39.

[5] *Id.* at ¶ 47.

[6] *Id.* at ¶ 33.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] 18 Pa. C.S.A. 2502(b) ("Murder of the second degree--A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.").

[13] PSR at ¶ 50.

[14] *Id.* at ¶ 33. There is a fourth offense listed in the PSR for which there is no discernable record:

> The subject was arrested on March 17, 1987 for theft by unlawful taking/disposition, theft by receiving stolen property and criminal conspiracy. He was charged with these offenses under Philadelphia Municipal Court Case 8703-1898. He failed to appear for court proceedings and a bench warrant was issued for his arrest. No details of this offense are available. The subject was arrested due to this bench warrant as referenced in paragraph 13 of the offense conduct section of this report. *Id.* at ¶ 37.

[15] *Id.* at ¶ 41.

[16] *Id.*

[17] *Id.* at ¶ 42.

[18] *Id.* at ¶ 49.

[19] *Id.* at ¶ 48. Mr. Martin self-reports he stopped using drugs for a few months in 1987. *Id.*

[20] PSR at ¶ 34 ("Martin admitted he carried the shotgun into the bank but qualified the use of the weapon by noting that it had no shells in the weapon and that the weapon had a broken hammer thus rendering it inoperable. An investigation of the weapon by the FBI confirmed that the shotgun was in fact inoperable and could not have been fired during the robbery.").

[21] *Id.*

[22] *Id.*

[23] ECF Doc. No. 137, at p. 2.

[24] PSR at ¶ 34.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* at ¶ 48.

[31] *Id.* at ¶¶ 34, 49.

[32] *Id.* at ¶ 34.

[33] *Id.* at ¶ 7.

[34] *Id.* at ¶ 8.

[35] *Id.*

[36] *Id.* at ¶ 9.

[37] *Id.*

[38] *Id.*

[39] *Id.* at ¶ 10.

[40] *Id.*

[41] *Id.*

[42] *Id.* at ¶ 11.

[43] ECF Doc. No. 119-1.

[44] 18 U.S.C. § 924(c).

[45] ECF Doc. No. 119-1.

[46] PSR at ¶ 15.

[47] ECF Doc. No. 131, at p. 1.

[48] 18 U.S.C. § 3559(c).

[49] *United States v. Martin*, No. 98-178, 2001 WL 493199, at* 1 (E.D. Pa. May 7, 2001). Mr. Martin appealed, and the United States Court of Appeals for the Third Circuit affirmed the judgment of conviction and sentence. *United States v. Martin*, 46 F. App'x 119 (3d Cir. 2002).

Mr. Martin repeatedly petitioned for *habeas* relief challenging this sentence.  On March 11, 2004, Mr. Martin petitioned for *habeas* relief under section 2255 attacking the validity of his sentence and arguing ineffective assistance of counsel. *United States v. Martin*, No. 98-178, 2005 WL 1168383 (E.D. Pa. May 16, 2005).  Judge Shapiro conducted an evidentiary hearing, made findings of fact, and denied Mr. Martin's section 2255 motion. *Id.*  Mr. Martin appealed, and our Court of Appeals affirmed Judge Shapiro's denial of his habeas motion. *United States v. Martin*, 262 F. App'x 392 (3d Cir. 2008).

In June 2016, we granted Mr. Martin's motion to appoint the Federal Community Defender Office for the Eastern District of Pennsylvania ("Federal Defender") to represent him in his pro se motion for habeas relief under *Johnson v. United States*, __ U.S. __, 135 S. Ct. 2551 (2015). ECF Doc. No. 125. Under 28 U.S.C. § 2255 incarcerated persons may, with the permission of the federal courts, file second or successive motions to challenge their sentence when there has been a change in the law.  Mr. Martin argued the Supreme Court in *Johnson* invalidated the residual clause definitions of "serious violent felony" in the three-strikes statute and "crime of violence" in the Armed Career Criminal Act.  On May 10, 2018, our Court of Appeals denied Mr. Martin's application under 28 U.S.C. §§ 2244 and 2255 to file a second or successive section 2255 motion. The Court of Appeals found "[e]ven if those residual clause definitions were invalid under

*Johnson*, however, [Mr. Martin] has not made a prima facie showing that his convictions of armed bank robbery under 18 U.S.C. § 2113(d) would not remain 'serious violent felonies' or 'crimes of violence' under the 'elements clause' definitions contained in those statutes." *In re Robert Earl Martin*, No. 16-2623 (*citing United States v. Wilson*, 880 F.3d 80, 88 (3d Cir. 2018)). After the mandate from our Court of Appeals denied Mr. Martin leave to file a second or successive petition, we denied his section 2255 motion. ECF Doc. No. 128.

On December 10, 2018, Mr. Martin *pro se* requested permission from our Court of Appeals to file a successive section 2255 application under *Sessions v. Dimaya,* __ U.S. __, 138 S. Ct. 1204 (2018). In *Dimaya*, the Supreme Court held the definition of "crime of violence" in the residual clause of the Immigration and Nationality Act, 18 U.S.C. § 16(b), is unconstitutionally vague. *Id.* On December 20, 2018, our Court of Appeals rejected his argument *Dimaya* invalidated the residual clauses of the Armed Career Criminal Act and the three-strikes statute. 18 U.S.C. § 3559(c). Our Court of Appeals also rejected his argument without the residual clauses his armed bank robberies do not constitute "crimes of violence" supporting his section 924(c) conviction or "serious violent felonies" supporting his section 3559(c) sentence. ECF Doc. No. 129.

On August 27, 2019, Mr. Martin *pro se* requested permission from our Court of Appeals to file a second or successive section 2255 motion under *United States v. Davis,* __ U.S. __, 139 S.Ct. 2319 (2019). In *Davis*, the Supreme Court held Congress's definition of "crime of violence" in the residual clause of the Armed Career Criminal Act was unconstitutionally vague. *Id.* But the Supreme Court reviewed the claim in a Hobbs Act robbery; it did not address armed bank robbery. After the Supreme Court's decision in *Davis*, our Court of Appeals authorized approximately two hundred previously stayed applications as second or successive section 2255 motions under section 924(c)(3)(B). *In re Matthews*, 934 F.3d 296, 298 n.2 (3d Cir. 2019). Our Court of Appeals directed the Clerk of the Court to transfer Mr. Martin's application back to us. *Id.* Citing the 2019 *Davis* holding, Mr. Martin *pro se* returned for a third petition *habeas* petition arguing his sentence is unconstitutional under *Davis*.

We denied this successive habeas petition. ECF Doc. No. 137. We held Judge Shapiro did not sentence him under the Armed Career Criminal Act; she sentenced him under the three-strikes statute, 18 U.S.C. § 3559(c), and our Court of Appeals affirmed the conviction. ECF Doc. No. 137. We found our Court of Appeals already held we cannot extend Supreme Court holdings striking residual clauses under the Armed Career Criminal Act to similar language in the three-strikes statute. *Id.* We found nothing in the Supreme Court's holding in *Davis* to distinguish Mr. Martin's renewed *pro se* argument or requiring we apply precedent under the Armed Career Criminal Act to his life sentence. *Id.* We further explained our Court of Appeals already held Mr. Martin's crime of armed bank robbery is a "crime of violence" under the elements clause of the Armed Career Criminal Act, so even if we applied it to a sentence under the three-strikes statute, the Supreme Court's 2019 holding in *Davis* relating to the residual clause did not warrant habeas relief. *Id.*

On May 26, 2020, Mr. Martin moved to vacate under Federal Rules of Civil Procedure 59(e) and 60(b) arguing we did not afford him adequate time to file a reply before our February 28, 2020 denial of his habeas petition after the United States opposed his petition on February 20, 2020. ECF Doc. No. 136. Out of an abundance of caution, on June 2, 2020 we reexamined our February 28, 2020 Order and found "no basis for error, no new facts or newly discovered evidence and no

finding of fraud, misrepresentation, or misconduct by the United States," and denied his motion. ECF Doc. No. 145, at p. 1.

[50] ECF Doc. No. 161, at pp. 27-28; ECF Doc. No. 161-1, at pp. 177-179.

[51] ECF Doc. No. 168, at p. 4.

[52] *Id.*

[53] ECF Doc. 161-1, at p. 3-5; PSR at ¶ 43.

[54] PSR at ¶ 43.

[55] *Id.* at ¶ 44.

[56] ECF Doc. 161-1, at p. 3.

> Ischemic cardiomyopathy (CM) is the most common type of dilated cardiomyopathy. In Ischemic CM, the heart's ability to pump blood is decreased because the heart's main pumping chamber, the left ventricle, is enlarged, dilated and weak. This is caused by ischemia - a lack of blood supply to the heart muscle caused by coronary artery disease and heart attacks.

https://my.clevelandclinic.org/health/diseases/17145-ischemic-cardiomyopathy

[57] ECF Doc. 161-1, at p. 3.

[58] *Id.*, at p. 5 (for hypertension).

[59] *Id.* (for hyperlipidemia).

[60] *Id.* (for hypertension and unsteady heart rhythm).

[61] *Id.* (for anticoagulation).

[62] *Id.* (for hypertension and heart failure).

[63] *Id.*, at p. 6.

[64] *Id.*, at pp. 18, 19, 33, 41.

[65] ECF Doc. No. 161-1, at p. 150.

[66] ECF Doc. No. 161, at p. 3.

[67] ECF Doc. No. 150.

[68] *Id.*, at p. 29.

[69] *Id.*

[70] *Id.*

[71] 18 U.S.C. § 3582.

[72] ECF Doc. No. 167, at p. 3 ("On March 30, 2020, Martin submitted a request for compassionate release to the warden.").

> The government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. Here, the defendant's conditions of COPD, obesity, congestive heart failure, coronary artery disease, and cardiomyopathy meet that test.

*Id.* at p. 12.

[73] *Id.*, at pp. 3, 12.

[74] U.S.S.G. § 1B1.13(2).

[75] *United States v. Salvagno*, No. 02-51, 2020 WL 3410601, at *7 (N.D.N.Y. Apr. 23, 2020).

[76] 18 U.S.C. § 3142(g).

[77] *United States v. Wyatt*, No. 97-3015, 2020 WL 3643467, at *8 (N.D. Iowa July 6, 2020).

[78] *United States v. Martinez*, No. 12-862-10, 2020 WL 2079542, at *2 (S.D.N.Y. Apr. 28, 2020).

[79] *United States v. Echevarria*, No. 17-0044, 2020 WL 2113604, at *3 (D. Conn. May 4, 2020). Mr. Martin cites language from our holding in *United States v. Ladson*, outlining how judges are more likely to grant compassionate release when the incarcerated person is further along in his or her sentence. *United States v. Ladson*, No. 04-697-1, 2020 WL 3412574 (E.D. Pa. June 22, 2020). We distinguish Mr. Martin's request because the court convicted Mr. Ladson of a Hobbs Act robbery, 18 U.S.C. § 1951(a), not an armed robbery; the court did not sentence Mr. Ladson to a life term; and the Bureau of Prisons expected to release him in November 2022. *Id.*

[80] *Wyatt*, 2020 WL 3643467, at *8.

[81] *Id.*, at *6 (internal citations omitted).

---

[82] *Id.*, at *10.

[83] *Id.*

[84] *See, e.g.*, *United States v. Levine*, No. 91-3, 2020 WL2537786 (N.D. Ind. May 19, 2020) (denying release to seventy-eight-year-old serving life sentence for orchestrating the murder of his brother and sister-in-law); *United States v. Arana*, No. 95-80272-13, 2020 WL 2214232 (E.D. Mich. May 7, 2020) (denying release to a defendant serving life sentence for drug offenses and murder who otherwise had a compelling medical justification for release); *United States v. Epstein*, No. 14-287-1, 2020 WL 2537648 (D.N.J. May 19, 2020) (denying release to a seventy-four-year-old defendant who suffers from numerous ailments, but committed violent kidnapping offenses); *United States v. Logan*, No. 96-20, 2020 WL 730879, at *3 (W.D. Ky. Feb. 13, 2020) (denying compassionate release to an eighty-one-year-old with prostate cancer, glaucoma, blindness, and diabetes who had served more than twenty-two years of a life sentence but reducing the defendant's sentence "would minimize the nature and seriousness of the offense," which involved arson resulting in four deaths).

[85] *Walker v. United States*, No. 16-21973, 2020 WL 2308468 (S.D. Fla. May 8, 2020).

[86] *Id.*

[87] *Id.*

[88] *See, e.g.*, *United States v. Pena*, No. 15-551, 2020 WL 2301199, at *1 (S.D.N.Y. May 8, 2020) (granting compassionate release of defendant who helped to organize an armed robbery, but distinguishable from the present case because Mr. Pena neither brandished a weapon nor participated in the robbery); *United States v. McCarthy*, No. 17-0230, 92-0230, 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020) (granting compassionate release of defendant convicted of armed bank robbery, but distinguishable because Mr. McCarthy had a history of excellent behavior on earlier supervised release, and suffered from serious mental health issues the court found would be better addressed outside the prison environment).

[89] *United States v. Morris*, No. 99-174, 2020 U.S. Dist. LEXIS 108905 (W.D. Wash. June 22, 2020).

[90] *Id.*, at *3-4.

[91] *Id.* at *10-12.

[92] *United States v. Williams*, No. 04-95, 2020 WL 1751545, at *1 (N.D. Fla. Apr. 1, 2020).

[93] *Id.*

[94] *Id.* at *3; *see also United States v. Parker*, No. 98-749-1, 2020 WL 2572525, at *14 (C.D. Cal. May 21, 2020) (granting compassionate release notwithstanding defendant's "leadership of a drug distribution network and his abuse of a position of trust," distinguishable from Mr. Martin because

Mr. Parker's history led the court to conclude he did not pose a danger to the community); *United States v. Curtis*, No. 03-533, 2020 WL 1935543, at *5-6 (D.D.C. Apr. 22, 2020) (granting compassionate release to career offender whose rapidly deteriorating health made him highly unlikely to "commit further crimes," distinguishable because Mr. Curtis was 85% blind and confined to a wheelchair while Mr. Martin is ambulatory).

[95] ECF Doc. No. 168, at p. 3.

[96] PSR at ¶¶ 34, 49.

[97] 18 U.S.C. § 3142(g).

[98] *See, e.g.*, *United States v. Davis*, No. 12-712, 2020 WL 3790562 (S.D.N.Y. July 7, 2020) (denying compassionate release while considering a positive disciplinary record while incarcerated); *United States v. Copeland*, No. 02-1120, 2020 WL 2537250, at *3 (E.D.N.Y. May 19, 2020) (granting compassionate release while after considering positive disciplinary record while incarcerated).

[99] *Pepper v. United States*, 562 U.S. 476, 491 (2011).

[100] *United States v. Loyd*, No. 15-20394-1, 2020 WL 2572275, at *4–5 (E.D. Mich. May 21, 2020); *United States v. Schafer*, No. 18-6152, 2020 WL 2519726, at *7 (W.D.N.Y. May 18, 2020).

[101] *Loyd*, 2020 WL 2572275, at *4.

[102] 18 U.S.C. § 3142(g).

[103] ECF Doc. No. 168, at p. 3-4.

[104] United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, p. 30 (December 2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf ("Among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released age 65 or older.").

[105] PSR at ¶ 43.

[106] *Id.* at ¶ 44.

[107] 18 U.S.C. § 3142(g).

[108] PSR at ¶¶ 34, 49.

[109] 18 U.S.C. § 3142(g).

[110] *United States v. Esparza*, No. 07-00294, 2020 WL 1696084 (D. Idaho Apr. 7, 2020).

[111] *Id.*, at *3.

[112] *Id.*, at *4.

[113] *Id.* (citing USSG § 1B1.13).

[114] *See* First Step Act of 2018, § 603(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

[115] 18 U.S.C. § 3142(g).

[116] 18 U.S.C. § 3582(c)(1)(A).

[117] *United States v. Rodriguez*, No. 03-00271, 2020 WL 1627331, at *6 (E.D. Pa. Apr. 1, 2020).

[118] 18 U.S.C. § 3553(a).

[119] *Id.*

[120] ECF Doc. No. 161, at pp. 25-26.

[121] *See, e.g.*, *Walker*, 2020 WL 2308468 (declining to reduce a life sentence after sixteen years served regardless of medical condition when instant and earlier offenses were violent); *Arana*, 2020 WL 2214232 (denying release to movant with a history of violent offenses); *Epstein*, WL 2537648 (denying release to a seventy-four-year-old defendant who suffers from numerous ailments but committed violent kidnapping offenses).

[122] *See, e.g.*, *Esparza*, 2020 WL 1696084 (denying release for seventy-year-old defendant suffering from heart disease and stage 4 kidney disease because he posed a danger to the community; "Esparza had drug trafficking convictions at ages 23, 40, 44, 50 and 59. It would be foolish to assume that he is unlikely to return to peddling drugs at age 70").

[123] *See, e.g.*, *United States v. Butler*, No. 19-834-10, 2020 WL 1689778 (S.D.N.Y. April 7, 2020) ("While the prospect of contracting COVID-19 undeniably presents a serious risk to [the defendant's] health, his [early] release . . . at least equally exposes the community to a serious risk that he would resume violence.").