ROBERT EARL MARTIN
REG. NO. 39869-066
FCI BUTNER MEDIUM II
FEDERAL CORR. INSTITUTION
P.O. BOX 1500
BUTNER, NC  27509

June 28, 2021

Ms. Kate Barkman
Clerk of Court
U.S. District Court
Eastern District of Pennsylvania
Philadelphia Division
601 Market Street, Room 2609
Philadelphia, PA 19106-1729

      RE:   *Martin v. United States*
             Crim No. 2:98-cr-00178-MAK-1

Dear Ms. Barkman:

    Enclosed please find and accept for filing Movant's Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018. Please submit this document to the Court.

    Thank you for your assistance in this matter.

                      Sincerely,

                      ROBERT EARL MARTIN
                      Appearing *Pro Se*

*Encl. as noted*

RECEIVED
JUL - 6 2021

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT EARL MARTIN, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | CR No. 2:98-cr-00178-MAK-1 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, ROBERT EARL MARTIN ("Martin"), appearing *pro se,* and in support

of this motion would show as follows:

## I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those

specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding

under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130

S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term

of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that

rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a

sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. §

3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence

modifications). Such defendants are entitled to move for retroactive modification of their sentences.

*Dillon*, 130 S.Ct. at 2690–91.

## II. STATEMENT OF THE CASE

### A.     Procedural Background

On April 7, 1998, a grand jury sitting in the United States District Court for the Eastern

District of Pennsylvania, Philadelphia Division, returned a two (2) count Indictment charging Martin.

See Doc. 10.[1] Count 1 charged Martin with Armed Bank Robbery, in violation of 18 U.S.C. §

2113(d). *Id.* Count 2 charged Martin with Using of a Firearm in Furtherance of a Crime of Violence,

in violation of 18 U.S.C. § 924(c). *Id.*

On May 28, 1998, the United States filed an Information charging prior offenses to establish

penalty of mandatory life imprisonment, pursuant 18 U.S.C. § 3559(c). See Doc. 15.

On July 1, 1998, Martin was found guilty of both counts by a jury trial before Honorable

Norma L. Shapiro. See Docs. 28, 29.

On August 1, 2001, Martin was sentenced to a total term of Life imprisonment, 3 years

supervised release, $6,694.00 in Restitution, and a Mandatory Special Assessment Fee of $200. See

Docs. 83, 84.

### B.     Statement of the Relevant Facts

#### 1.     Offense Conduct

On March 6, 1998, at approximately 12:40 p.m., there was a robbery of the United
Bank branch located at 280-West Girard Avenue, Philadelphia, PA. The United
Bank's deposits are insured by the Federal Deposit Insurance Corporation (FDIC).
In the March 6 robbery, a black male entered the United Bank alone, carrying a
sawed-off double-barreled shotgun. The robber was wearing a green baseball cap, a
blue hooded zip-up sweatshirt, blue jeans, and tan work boots.

---

[1] "Doc." refers to the Docket Report in the United States District Court for the Eastern District of Pennsylvania, Philadelphia Division in Criminal No. 2:98-cr-00178-MAK-1, which is immediately followed by the Docket Entry Number. "PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number.

The robber approached an unarmed female bank guard who was standing in the bank lobby and announced that this was a bank robbery. He placed the sawed-off shotgun next to her head and demanded that he be let into the teller area. The teller area is separated from the bank lobby by two locked doors, both of which can be entered from the bank lobby side only by use of a buzzer system.

At first, the guard pushed the shotgun barrel away from her head. The robber hit her in the head with the shotgun, and told her that he was not joking, he would shoot her. The robber told bank personnel in the teller area that he would blow the guard's head off if they did not let him in.

A customer service representative buzzed the robber through the two locked doors, into the teller area. The robber held the sawed-off shotgun on the bank guard as he came in. Once inside the teller area, the robber shoved the bank guard onto the floor and opened a cash drawer, removing approximately $6,694 in United States currency. The robber held the shotgun on the customer service representative while he rifled the cash drawer.

The robber left the bank, stuffing the money into his sweatshirt pockets as he left. He escaped on foot, running eastbound on West Girard Avenue and north on 28th Street.

After the robbery, FBI agents interviewed a bank teller from whose drawer the robber had taken the money. She was present during the robbery, standing in the teller area when the robber took the money from her drawer. In describing robber, she stated that he struggled --when he walked.

A series of surveillance photographs depicting the robber were obtained from United Bank. They show a man wearing a baseball cap, zip-up sweatshirt, blue jeans and work boots. In several pictures, the robber can be seen standing in a "pigeon-toed" manner, that is, with his toes facing inward.

Philadelphia Police Department officers showed surveillance photographs to a woman who lives in the area of the bank. She stated that she knew the man in the photos, as "Rob." She told the officers that "Rob" worked at a barber shop at 25th and Master Streets. Officers went to the barber shop and determined that the person known to her as "Rob" was named Robert Earl Martin. Martin was taken into custody by the officers on a local bench warrant for failure to appear on charges of theft and unlawful taking.

See PSR ¶¶ 7-14.

2.     Trial Proceeding

Three bank employees testified at trial and positively identified him as the person who committed the bank robbery. See PSR ¶ 15. On July 1, 1998, a jury found Martin guilty on both counts. See Docs. 28, 28. The case was referred to the Probation Office for the preparation of the PSR.

3.     Presentence Report Calculations and Recommendations

On March 6, 2000, the Probation Office prepared Martin's PSR, using the 1998 edition of the Guidelines Manual. Count 1: Armed Bank Robbery calls for a Base Offense Level of 20, pursuant to U.S.S.G. § 2B3.1. See PSR ¶ 21. Two (2) levels were added for taking property of a financial institution, pursuant to U.S.S.G. § 2B3.1(b)(1). See PSR ¶ 22. The PSR calculated Martin's Total offense Level to be level 22. See PSR ¶ 30. Martin's total criminal history points of 5, placed him in Criminal History Category III. See PSR ¶ 36. Based upon a Total Offense Level of 22 and a Criminal History Category of III, the guideline range for imprisonment was 51 to 63 months to be followed by 240 months consecutive term. However, based on the provisions of 18 U.S.C. § 3559(c), the guideline sentence is life. (§ 5G1.1(b)). See PSR ¶ 60.

4.     Sentencing Proceeding

Prior to sentencing, the United States sought life imprisonment under section 3559(c), known as the "three-strikes" statute, based on his 1974 conviction for second-degree murder and the 1988 conviction for carrying a firearm in relation to the bank robbery and armed bank robbery.

On August 1, 2001, a Sentencing Hearing was held before Judge Norma L. Shapiro. See Doc. 83. The Court adopted the PSR as its own and sentence Martin to a total term of Life imprisonment, followed by 3 years of supervised release. See Doc. 84. The Court also ordered payment of $6,694.00

in Restitution and a Mandatory Special Assessment Fee of $200. *Id.* A timely Notice of Appeal was filed on August 2, 2001. See Doc. 86.

    5.  Appellate Proceeding

  On Appeal, Martin makes two arguments - first, that the prosecutor denied his right to due process and a fair trial by stating her beliefs regarding the evidence and mischaracterizing the testimony of the photographic evidence expert; second, that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the government was required to prove his two prior violent felony convictions to the jury beyond a reasonable doubt in order for the "three strikes" mandatory life sentence to apply. See *United States v. Martin*, 46 Fed.Appx. 119 (3d Cir. 2002).

    6.  PostconvictionProceeding

  On March 11, 2004, Martin filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), arguing that his trial counsel committed three errors that violate an objective standard of reasonableness, and these errors individually and cumulatively resulted in prejudice sufficient to undermine confidence in the outcome of his trial. See Doc. 92. On May 17, 2005, the Court issued an Order denying Martin's § 2255 Motion. See Doc. 106.

  On January 6, 2020, Martin filed a § 2255 Motion, through the Federal Defender, argued the Supreme Court in *Johnson* invalidated the residual clause definitions of "serious violent felony" in the three-strikes statute, 18 U.S.C. § 3559, and "crime of violence" in ACCA, § 924(c)(3).

  On May 10, 2018, the United States Court of Appeals for the Third Circuit, No. 16-2623, denied Martin's application under 28 U.S.C. §§ 2244 and 2255 to file a second or successive § 2255 motion. The Court of Appeals found "[e]ven if those residual clause definitions were invalid under

*Johnson*, however, [Martin] has not made a *prima facie* showing that his convictions of armed bank robbery under 18 U.S.C. § 2113(d) would not remain 'serious violent felonies' or 'crimes of violence' under the 'elements clause' definitions contained in those statutes." On February 28, 2020, after the mandate from the Third Circuit Court of Appeals denied Martin leave to file a second or successive petition, the District Court denied Martin's § 2255 motion and declined to issue a certificate of appealability ("COA"). See Doc. 137.

On June 8, 2020, Martin filed an Application for COA (after his request for an extension of time to file application for COA was granted), which the Third Circuit denied on September 9, 2020. On September 25, 2020, Martin filed a Petition for Rehearing En Banc and before Original Panel. On November 2, 2020, the Third Circuit denied his petition.

## III. DISCUSSION

As a preliminary matter, Martin respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *Higgs v. Attorney Gen. of The United States*, 655 F.3d 333 (3rd Cir. 2011); *Estelle v. Gamble*, 429 U.S. 97 (1976)(same); and *Haines v. Kerner*, 404 U.S. 519 (1972)(same).

### A.   Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Martin's sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not

7

limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

1. Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. §3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. §3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id*. at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id*. Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

2.   Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or
Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission...shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

In 2007, the Sentencing Commission defined "extraordinary and compelling reasons" as follows:

(A)   Extraordinary and Compelling Reasons - Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the following circumstances:

(i)      The defendant is suffering from a terminal illness.
(ii)     The defendant is suffering from a permanent physical or medical condition, or is experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self care within the environment of a correctional facility and for which conventional treatment promises no substantial improvement.
(iii)    The death or incapacitation of the defendant's only family member capable of caring for the defendant's minor child or minor children.
(iv)     As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason for purposes of subdivision (1)(A). USSG §1B1.13, Application Note 1.

As we will see, with the passage of The First Step Act, subparagraph (iv) is no longer limited by what the BOP decides is extraordinary and compelling.

9

Historically, the BOP rarely filed motions under §3582(c)(1)(A), even when the inmates met

the objective criteria for modification. See U.S. Dep't of Justice Office of the Inspector General, The

Federal Bureau of Prisons Compassionate Release Program (Apr. 2013). The Office of the Inspector

General also found that the BOP failed to provide adequate guidance to staff on the criteria for

compassionate release, failed to set time lines for review of compassionate release requests, failed to

create formal procedures for informing prisoners about compassionate release, and failed to generate

a system for tracking compassionate release requests. *Id.* at i-iv.

Congress heard those complaints and in late 2018 enacted The First Step Act.

      3.    <u>The First Step Act</u>

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things,

transformed the process for compassionate release. Id. at §603. Now, instead of depending upon the

BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of

a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file

an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30

days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

18 U.S.C. §3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability

to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this

change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346,

H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release

under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199

at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes

"a number of very positive changes, such as … improving application of compassionate release, and

providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

> 4.    Martin Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

On November 13, 2020, Martin filed a request for compassionate release to D. Leu, Warden, FCI Butner II, North Carolina, which was denied on November 19, 2020. See Exhibit 1. Because the BOP failed to file a motion on Martin's behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

## B.    Martin's Current Conditions of Confinement and Health Conditions

Martin, age 67, suffers from incurable, progressive disease, from which Martin will never recover, to wit: cardiomyopathy, pulmonary hypertension, dislipidemia, hypertension, chronic obstructive pulmonary disease (COPD), history of dysrhythmia, asthma, and obesity.[2] See Exhibit

---

[2]

*Cardiomyopathy*. Cardiomyopathy is a general term for diseases of the heart muscle. Depending on the type of cardiomyopathy you have, the condition may cause your heart muscle to become enlarged, rigid, thick or thin. In rare cases, the normal muscle tissue of the heart is replaced with scar tissue. Over time, cardiomyopathy can weaken the heart, negatively affecting its ability to maintain a normal electric rhythm and/or pump enough blood to the body. This can lead to a variety of issues and complications, including arrhythmias, heart valve problems and even heart failure.

*Dyslipidemia*. Dyslipidemia is a high level of lipids (cholesterol, triglycerides, or both) or a low high-density lipoprotein (HDL) cholesterol level. Lifestyle, genetics, disorders (such as low thyroid hormone levels or kidney

2.      **Signs, Symptoms and Potential Complications**

In the early stages of cardiomyopathy, you may not experience any signs or symptoms, but as the condition advances, signs and symptoms of heart failure usually appear, including:

- Shortness of breath (dyspnea)
- Chronic coughing or wheezing
- Rapid or irregular heart rate
- Build-up of fluid and swelling (edema)
- Nausea or lack of appetite
- Fatigue or feeling light-headed
- Confusion or impaired thinking

COVID-19 has infected hundreds of prisoners and staff in city jails, state prisons and federal prisons.

New York, California and Ohio were among the first to release incarcerated people. Other states have followed, saying it is the only way to protect prisoners, correctional workers, their families and the broader community.

---

disease), drugs, or a combination can contribute.

*Hypertension*. Hypertension is another name for high blood pressure. It can lead to severe health complications and increase the risk of heart disease, stroke, and sometimes death. Blood pressure is the force that a person's blood exerts against the walls of their blood vessels. This pressure depends on the resistance of the blood vessels and how hard the heart has to work. Hypertension is a primary risk factor for cardiovascular disease, including stroke, heart attack, heart failure, and aneurysm. Keeping blood pressure under control is vital for preserving health and reducing the risk of these dangerous conditions.

*Obesity*. Obesity is a complex disease involving an excessive amount of body fat. Obesity isn't just a cosmetic concern. It is a medical problem that increases your risk of other diseases and health problems, such as heart disease, diabetes, high blood pressure and certain cancers. Obesity is diagnosed when your body mass index (BMI) is 30 or higher. To determine your body mass index, divide your weight in pounds by your height in inches squared and multiply by 703. Or divide your weight in kilograms by your height in meters squared.

*Asthma*. Asthma is a long-term disease of the lungs. You might hear your doctor call it a chronic respiratory disease. It causes your airways to get inflamed, narrow and swell, and produce extra mucus. This can make breathing difficult and trigger coughing, wheezing, shortness of breath, and chest tightness are classic asthma symptoms. Asthma attacks can be fatal. A severe asthma attack can prevent you from getting enough oxygen into your lungs and can even stop your breathing. Therefore, severe asthma attack requires emergency medical attention.

*Chronic Obstructive Pulmonary Disease*. Chronic obstructive pulmonary disease, commonly referred to as COPD, is a group of progressive lung diseases. The most common are emphysema and chronic bronchitis. Many people with COPD have both of these conditions. Emphysema slowly destroys air sacs in your lungs, which interferes with outward air flow. Bronchitis causes inflammation and narrowing of the bronchial tubes, which allows mucus to build up.

There's no cure for COPD, but treatment can help ease symptoms, lower the chance of complications, and generally improve quality of life. Medications, supplemental oxygen therapy, and surgery are some forms of treatment. Untreated, COPD can lead to a faster progression of disease, heart problems, and worsening respiratory infections.

Jails and prisons often lack basic hygiene products, have minimal health care services and are overcrowded. Social distancing is nearly impossible except in solitary confinement, but that poses its own dangers to mental and physical health.

While there is absolutely no evidence to support that any person is more or less likely to be infected [with COVID-19] based on existing medical conditions, Martin's argues that, first, prisoners experience exponentially higher rates of COVID-19 than the general population. As of June 2020, "[t]he COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate."[3] Second, and more critically, older individuals and individuals with chronic medical conditions are at greater risk of hospitalization and death from COVID-19. For example, the CDC reports that persons aged 40 to 49 are 15 times more likely to be hospitalized and 130 times more likely to die from COVID-19 compared to persons aged 18 to 29 and younger.[4] In other words, Martin does not only contend that his health conditions increase his risk of getting COVID-19; but also, he contends that those conditions greatly increase the risk that, if contracted, his COVID-19 infection would be severe or even deadly.

### *BOP Amid Covid-19*

One consequence of overcrowding is that prison officials have a difficult time providing adequate health care.

In 2011 the U.S. Supreme Court ruled that overcrowding undermined health care in

---

[3] Brendan Saloner, *et al.*, *COVID-19 Cases and Deaths in Federal and State Prisons*, J. of the Am. Med. Ass'n (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

[4] *Hospitalizations & Death by Age*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated May 14, 2021).

California's prisons, causing avoidable deaths. The justices upheld a lower court's finding that this caused an "unconscionable degree of suffering" in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

Amid a worldwide pandemic, such conditions are treacherous. Some of the worst COVID-19 outbreaks in U.S. prisons and jails are in places – like Louisiana and Chicago – whose prison health systems have been ruled unconstitutionally inadequate. Criminologists and advocates say many more people should be released from jails and prison, even some convicted of violent crimes if they have underlying health conditions.

The decision to release prisoners cannot be made lightly. But arguments against it discount a reality recognized over two centuries ago: The health of prisoners and communities are inextricably linked. Coronavirus confirms that prison walls do not, in fact, separate the welfare of those on the inside from those on the outside.

**C.**    **Martin Has "Extraordinary and Compelling Reasons" For Compassionate Release**

The principles of Compassionate Release allow for Martin's early release. As discussed above, the principles for release are no longer limited to BOP guidelines; federal courts have the power to determine what constitutes extraordinary and compelling circumstances.

1.    COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Martin.

The COVID-19 pandemic continues to roil the United States. As of April 29, 2021, the BOP has 126,247 federal inmates in BOP-managed institutions and 13,636 in community-based facilities. The BOP staff complement is approximately 36,000. There are 352 federal inmates and 815 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 234 federal

14

inmate deaths and 4 BOP staff member deaths attributed to COVID-19 disease. See https://www.bop.gov/coronavirus/ (last accessed April 29, 2021). Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

\

15

2.   <u>Martin's Vulnerability to COVID-19 Due to His High Medical Risk
Is an Extraordinary and Compelling Reason That Warrants a Sentence
Reduction.</u>

Martin is particularly vulnerable to COVID-19 because of his advanced age, cardiomyopathy,

pulmonary hypertension, dislipidemia, hypertension, COPD, dysrhythmia history, asthma, and obesity.

At the time of sentencing, the Court could not have anticipated that Martin's diseases will place him

in the "high risk" category nor the existence of the COVID-19. As the COVID-19 pandemic

continues, it potentially poses a particular issue for older people and people with pre-existing medical

conditions (such as serious heart condition, lung disease, and autoimmune disease) appear to be more

vulnerable to becoming severely ill with the COVID-19 virus.

*Lung Problems, Including Asthma*
COVID-19 targets the lungs, so you're more likely to develop severe symptoms if
you have preexisting lung problems, such as: Moderate to severe asthma, Chronic
obstructive pulmonary disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary
fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your
lungs and inhibit your immune system, which increases the risk of serious
complications with COVID-19.

*Heart Disease, Diabetes and Obesity*
People with diabetes, heart disease, high blood pressure or severe obesity are more
likely to experience dangerous symptoms if infected with COVID-19. This may be of
particular concern in the United States, which has seen increasing rates of obesity and
diabetes over the years.

Obesity and diabetes both reduce the efficiency of a person's immune system.
Diabetes increases the risk of infections in general. This risk can be reduced by
keeping blood sugar levels controlled and continuing your diabetes medications and
insulin. Your risk of serious illness may also be higher if you have heart diseases such
as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or
coronary artery disease.

*How SARS-COV-2 Causes Disease and Death in COVID-19*
"You'd think underlying lung problems or immune system problems will be the
greatest risk," says Dr. Levitt. "But it seems the biggest risk factors have been
hypertension, diabetes and obesity." That has led many scientists to suspect that the
profound inflammation seen in severe cases of COVID-19 may be yet another
problem linked to SARS-COV-2's fondness for ACE2. People with diabetes,

hypertension and heart disease have more ACE2 on their cells as a response to the higher levels of inflammation that come with their condition; ACE2 has an anti-inflammatory effect. When SARS-COV-2 sticks to ACE2 and reduces its ability to do its job, the underlying inflammation gets worse.

When inflammation gets completely out of control the body enters what is called a cytokine storm. Such storms drive the most severe outcomes for COVID-19, including multi-organ failure. There is thus an obvious role for anti-inflammatory drugs. But knowing when to administer them is hard. Go too late, and the storm will be unstoppable; go too early, and you may dampen down an immune response that is turning the tide. A recent article in the Lancet suggests that it would help if COVID-19 patients were routinely screened for hyper-inflammation to help identify those who might benefit from anti-inflammatory drugs. But not everyone is convinced today's drugs have much to offer. "We tried [a range of anti-inflammatory treatment] and it actually didn't work," says Rajnish Jaiswal, who has been working on the front line of COVID-19 treatment at New York's Metropolitan Hospital.

https://www.economist.com/briefing/2020/06/06/how-sars-cov-2-causes-disease-and-death-in-covid-19.

Hence, it is appropriate for Martin to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

**Note:**   According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

a.   Based on what we know now, those at high-risk for severe illness from COVID-19 are:
  • People 60 years and older
  • People who live in a nursing home or long-term care facility

b.   People of all ages with underlying medical conditions, particularly if not well controlled, including:

- Cancer
- Chronic kidney disease
- Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension
- Dementia or other neurological conditions
- Diabetes (type 1 or type 2)
- Down syndrome
- Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)
- HIV infection
- Immunocompromised state (weakened immune system)
- Liver disease
- Overweight and obesity
- Pregnancy
- Sickle cell disease or thalassemia
- Smoking, current or former
- Solid organ or blood stem cell transplant
- Stroke or cerebrovascular disease, which affects blood flow to the brain
- Substance use disorders

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Martin's high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like FCI to practice any of the hygienic and social distancing techniques that the Center for Disease

Control has put in place to prevent rapid transmission, and the fact that Martin suffers from ailments that have already been identified as "high risk," this Court should find that Martin's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few months, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have

a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

3.   Courts Have Granted Compassionate Release in Light of the Instant
Pandemic.

Courts in the Southern and Eastern Districts of New York have granted compassionate

release based on COVID-19. See *United States v. Wilson Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y.

Apr. 1, 2020), ECF No. 98, (granting release based on health issues and finding court could waive

exhaustion requirement; government did not object based on defendant's medical conditions); *United

States v. Mark Resnick*, No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting

compassionate release because of defendant's age and medical conditions in light of COVID-19);

*United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting

compassionate release motion, where government consented, because of defendant's age and medical

conditions and the risk posed by COVID-19); *United States v. Damian Campagna*, No. 16 Cr. 78

(LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release

sentencing reduction to defendant convicted of firearms offenses based on defendant's health and

threat he faced from COVID-19; government consented to reduction and agreed health issues and

COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr. 834 (PAE)

(S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release after BOP denied the request

and converting remaining sentence to home confinement).

So, too, have courts across the country. See *United States v. Andre Williams*, No. 04 Cr. 95

(MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's health and COVID-19);

*United States v. Teresa Ann Martin*, No. 18 Cr. 232 (TOR) (E.D. Wa. Mar. 25, 2020), ECF No. 834

(waiving any further exhaustion attempts as futile and granting compassionate release based on

defendant's health issues and COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine "extraordinary and compelling" reasons and granting compassionate release based in part on defendant's health and COVID-19; no exhaustion issue because 30 days had passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF No. 578 (granting compassionate release based on health conditions that made inmate susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH) (D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19); *US v. Foster*, No. 1:14-cr-324-02 (M.D. Pa. Apr. 3, 2020) ("The circumstances faced by our prison system during this highly contagious, potentially fatal global pandemic are unprecedented. It is no stretch to call this environment 'extraordinary and compelling,' and we well believe that, should we not reduce Defendant's sentence, Defendant has a high likelihood of contracting COVID-19 from which he would "not expected to recover." USSG §§ 1B1.13. No rationale is more compelling or extraordinary."); *US v. Powell*, No. 1:94-cr-0316-ESH (D.D.C. Mar. 24, 2020), Recommendation, Dkt. 94 (Court recommendation to BOP to immediately place defendant, who is 55-years old and suffers from several respiratory problems (including asthma and sleep apnea) into home confinement to serve the remainder of his prison term).

See also *United States v. Watkins*, Case No. 15-20333 (E.D. Mich. Jul. 16, 2020), granting

compassionate release to prisoner whose only underlying condition was previously-treated latent TB;

and *Singh v. Barr*, No. 20-CV-02346-VKD, 2020 WL 1929366, at *10 (N.D. Cal. Apr. 20, 2020)

(granting release from immigration custody for petitioner with latent TB, hypertension, and obesity);

and *United States v. Gerard Scparta*, No. 18 Cr. 578 (AJN), ECF Dkt. 69 (S.D.N.Y. Apr. 19, 2020).

In *Scparta*, Judge Nathan granted a compassionate release motion of a 55-year old defendant who

suffers from high blood pressure, high cholesterol, sleep apnea, and hypertension. The court found

that it could waive § 3582(c)(1)(A)'s 30-day waiting period and hear the motion, and describes FCI

Butner's "Kafkaesque" "14-day quarantine" process—which is neither a true "quarantine" nor

actually limited to 14 days—before releasing inmates to home confinement.

   4.   <u>First Step Act of 2018: Sentencing Reform</u>

**"Three Strikes" Law**

   The FIRST STEP Act makes very significant changes to drug sentencing laws and mandatory

minimums for repeat offenders in general. Importantly, these changes in applicable mandatory

minimums are going to apply to anyone who has not yet been sentenced for their crimes.

- The term "serious drug felony" is added to the definitions section of the Controlled Substances Act in 21 U.S.C. 802. A "serious drug felony" includes any conviction for a qualifying "serious drug offense" crime listed in 18 U.S.C. 924(e)(2)

1. Resulted in 12 months or more of prison for this particular defendant; and
2. The defendant was released from prison within 15 years of the current offense.

- The term "serious violent felony" is added to the Controlled Substances definitions also. A "serious violent felony" is defined as a prior conviction for:

1. Any offense described in 18 U.S.C. 3559(c)(2)(F) [listing specific qualifying crimes, and containing an elements and residual clause] that resulted in 12 months or more of prison for this particular defendant; and
2. Any offense under 18 U.S.C. 113 [crimes within maritime and territorial

jurisdiction of U.S.] which resulted in a 12 month or longer sentence for this defendant.

There are a few very important changes to existing law in these definitions. First, both definitions require that for any prior conviction to be used, the particular defendant must have received a sentence of more than 12 months imprisonment. This is a change from current law which applies to all prior convictions where a sentence of 12 months or more could have been imposed for the offense.

Second, the prior "serious drug felony" definition incorporates a time limitation for penalty enhancements. This is extremely important since it will no longer allow massively higher mandatory minimums for offenses where the defendant was released from prison more than 15 years prior to his or her current offense.

- Changing 841(b)(1)(A)(vii) mandatory minimums for offenders with one prior qualifying "serious drug felony" or "serious violent felony." The current mandatory minimum is 20 years, but the FIRST STEP Act reduces the minimum to 15 years.
- Making a similar change to mandatory minimums for offenders with two or more prior convictions. Current mandatory minimum is life imprisonment, but the FIRST STEP Act reduces the minimum to 25 years.

These two changes in the criminal justice reform bill end the so-called "three strikes" law that has forced mandatory lifetime sentences on thousands of inmates in the last 30 years. There would no longer be mandatory minimum life sentences for these crimes; instead, a floor of 25 years would be imposed for any sentence. Additionally, repeat offenders with only one prior qualifying conviction would be facing mandatory minimums of 15 years instead of 20 under this law.

In this case, the United States sought life imprisonment under section 3559(c), known as the "three-strikes" statute, based on his 1974 conviction for second-degree murder and the 1988

conviction for carrying a firearm in relation to the bank robbery and armed bank robbery.

Accordingly, Martin argues that the enhancement to mandatory life imprisonment no longer applies because second-degree murder does not categorically qualify as a serious violent felony under 18 U.S.C. § 3559(c)(2) because it was not a murder "as described" in § 1111 of Title 18.

Second-degree murder does not constitute a crime of violence under the elements clause—18 U.S.C. § 924(c)(3)(A)—because it can be committed recklessly. The elements of second-degree murder are that the defendant (1) "unlawfully kill[ed] a human being" (2) "with malice aforethought." 18 U.S.C. § 1111(a); Ninth Circuit Model Criminal Jury Instruction 8.108. "[M]alice aforethought covers four different kinds of mental states: (1) intent to kill; (2) intent to do serious bodily injury; (3) depraved heart (i.e., reckless indifference); and (4) intent to commit a felony." *United States v. Pineda-Doval*, 614 F.3d 1019, 1038 (9th Cir. 2010). As such, second-degree murder may be committed recklessly—with a depraved heart mental state—and need not be committed willfully or intentionally. See *United States v. Houser*, 130 F.3d 867, 871–72 (9th Cir. 1997) ("Malice aforethought does not require an element of willfulness if the existence of that malice is inferred from the fact that defendant acted recklessly with extreme disregard for human life.").

Second-degree murder is not categorically a crime of violence under the elements clause, 18 U.S.C. § 924(c)(3)(A). And, pursuant to *Davis*, second-degree murder cannot constitute a crime of violence under the residual clause, section 924(c)(3)(B), as the residual clause is unconstitutionally vague. Hence, the application of the three-strike law does not apply to Martin as his second-degree murder does not qualify as a serious violent felony.

**Note:** According to the PSR, Martin's 1973 second-degree murder was a result of "one of the patrons swung at him with a bar stool and it accidentally hit the gun causing it to fire, fatally

24

injuring an innocent bystander. See PSR ¶ 33. Indeed, it was an accident, it was not premeditated or

intentional. Martin's 1988 armed bank robbery offense was committed with the use of a weapon with

no shells and inoperable. An investigation of the weapon by the FBI confirmed that the shotgun was

in fact operable and could not have been fired during the robbery.

### 924(c) Stacking

Section 403 of the Act eliminates the so-called "stacking" of 18 U.S.C. § 924(c)(1)(A)

penalties. Section 924(c) provides for various mandatory consecutive penalties for the possession,

use, or discharge of a firearm during the commission of a felony violent or drug offense. However,

for a "second or subsequent conviction" of 924(c), the mandatory consecutive penalty increases to

25 years.

Now, under the Act, to avoid such an absurd and draconian result, Congress has clarified that

the 25-year mandatory consecutive penalty only applies "after a prior conviction under this subsection

has become final." Thus, the enhanced mandatory consecutive penalty no longer can be applied to

multiple counts of 924(c) violations.

In light of the "First Step Act" (FSA) of 2018, and its "clarification" of Section 924(c) of Title

18, United States Code, Martin would not be subject to "stacked" punishment for the "second and

subsequent" 18 U.S.C. § 924(c) counts. At this stage of the proceedings, Martin would invite the

District Court to take into consideration that the "FSA of 2018" made a "clarifying" change to 18

U.S.C. § 924(c) that clearly indicates that a defendant who faces multiple 18 U.S.C. § 924(c)

conviction in a single proceeding would not be subject to "stacked" punishment. i.e., 5 years for the

first § 924(c) and 25 years for each subsequent 18 U.S.C. 5 924(c) conviction. Indeed, Congress in

clarification of Section 924(c)(1)(C) of Title 18, United States Code, amended in the matter

preceding clause (i) by striking "second" or subsequent conviction under this subsection and inserting "violation of this subsection that occurs after a prior conviction under this subsection has become final." Clearly Congress "clarified" the meaning of the phrase "second and subsequent" therein Section 924(c) and in doing so made clear that Title 18 U.S.C. § 924(c) offenses charged in a single indictment and adjudicated in a single proceeding could not be considered "second and subsequent" to the first 18 U.S.C. § 924(c) offense charged.

**Example:** Contemplates five-year mandatory minimum terms for using, carrying, or possessing a firearm in furtherance of a crime of violence or drug trafficking offense. Higher mandatory minimums apply depending on other factors such as whether the firearm was brandished (seven years) and whether the firearm was a machine gun (30 years) among others.

| 924(c) Counts of Conviction in the Same Indictment | BEFORE the First Step Act | AFTER the First Step Act |
| --- | --- | --- |
| 1 Count | Mandatory minimum of 5 year | Mandatory minimum of 5 years |
| 2 Counts | Mandatory minimum of 5 + 20 = 25 years | Mandatory minimum of 5 + 5 = 10 years |
| 3 Counts | Mandatory minimum of 5 + 20 + 20 = 45 years | Mandatory minimum of 5 + 5 + 5 = 15 years |
| 4 Counts | Mandatory minimum of 5 + 20 + 20 + 20 = 65 years | Mandatory minimum of 5 + 5 + 5 + 5 = 20 years |

**Effective date of these changes:** The Act provides that the amendments to section 924(c) shall apply to any offense that was committed before the date of enactment of this Act.

If sentence today, Martin would receive a substantially less harsh sentence for the same criminal conduct. He therefore requests this Court order a hearing to impose a reduced sentence

under the FSA's applicable statutory range, i.e. the current statutory penalties. Martin requests this Court order an updated presentence report so that his sentencing guidelines may be recalculated in accordance with law. At such a hearing, all the relevant statutory sentencing factors under 18 U.S.C. § 3553(a) will be addressed in order to achieve a sentence that his sufficient but not greater than necessary.

In effect, Section 403 of the First Step Act should dictate a term of 5 years on Count 2 (for 924(c) count). Here, a sentence reduction to reflect Martin's new Guidelines range is in the interests of justice and furthers the purposes set forth in 18 U.S.C. § 3553(a).

As to the Second-degree murder conviction on Count 1, however, the court is required to set aside Martin's life sentence because second-degree murder does not categorically qualify as a serious violent felony under 18 U.S.C. § 3559(c)(2). As such, the mandatory life sentence imposed for Count 1 must be vacated in accordance with the First Step Act. Martin is eligible for relief under the First Step Act, and the court will reduce his sentence on Count 1 to 20 years, to run consecutive with the 5-year sentence on Count 1, for a total term of 25 years' imprisonment.

In *United States v. McCoy*, 981 F.3d. 271, 287 (4th Cir. 2020), the Fourth Circuit considered a question substantially similar to the one we now face: whether it is permissible for district courts, at step one of § 3582(c)(1)(A)'s test, to consider the First Step Act's elimination of "sentence-stacking" under 18 U.S.C. § 924(c), even though Congress chose not to make that change retroactive to all defendants who received stacked sentences prior to the First Step Act. *McCoy*, 981 F.3d at 284-87. The Fourth Circuit concluded that it was permissible for district courts to "treat[] as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' § 924(c) sentences and the extent of the disparity between the defendants' sentences and those provided

for under the First Step Act." *Id.* at 286. The Fourth Circuit emphasized, however, that it was not the length of the original sentences alone that constituted "extraordinary and compelling reasons." Rather, the Fourth Circuit, noted, the judgments before it "were the product of . . . full consideration of the defendants' individual circumstances," including, but not limited to, their § 924(c) sentences. *Id.* Those circumstances included "the defendants' relative youth . . . at the time of their offenses," the amount of time each defendant had already served on their original sentences, the defendants' "excellent institutional records," and the "substantial steps toward rehabilitation" taken by the defendants. *Id.*

**D.    Recidivism Risk Level**

In his 278 months of imprisonment, Martin has matured from a rash middle-aged man pursuing a lawless lifestyle, to a reflective, empathetic matured responsible adult. According to the Overview of Federal Criminal Cases published by the United States Sentencing Commission for the fiscal year of 2020, the average sentence imposed for murder is 255 months, about twenty-three months more than Martin's already served sentence for armed bank robbery. U.S. SENTENCING COMM'N, OVERVIEW OF FEDERAL CRIMINAL CASES, FISCAL YEAR 2020, at 9 (2021). However, Martin was not sentenced for murder, but rather for armed bank robbery. He was 43 years old when he committed the instant offense, thus he has served more than one-third of his life behind bars. This is significant punishment for his armed bank robbeyr, depriving him of "the family life" that he "cherish[es] more than anything."

Martin urges the Court to consider the following case citations:

- *United States v. Marks*, 03-CR-6033L (W.D.N.Y. Apr. 20, 2020) quoting *United States v. Redd*, No. 97-cr-00006, 2020 WL 1248493, at *6 (E.D.Va. Mar. 16, 2020) (concluding that the "gross disparity between the sentence Mr.

Redd received and the sentence he would have received after the First Step Act," due to Congress' elimination of "stacking" § 924(c) charges, were "extraordinary and compelling developments that constitute extraordinary and compelling reasons that warrant a reduction to Mr. Redd's sentence of incarceration").

- *United States v. Clark*, Case No. 11-CR-30-2-JPS (E.D. Wis. Jul. 23, 2020) quoting that in *Redd*, the Court evaluated whether extraordinary and compelling reasons existed to reduce the sentence by considering (1) the sentence the defendant originally received compared to the one he would receive today; (2) the disparity between those sentences; and (3) the reason for that disparity. *Redd*, 2020 WL 1248493, at *5. There, the court determined that the disparity was "primarily the result of Congress' conclusion that sentences like [defendant's] are unfair and unnecessary." *Id.* at *6.

- *United States v. Brooks*, Case No. 07-cr-20047-JES-DGB (C.D. Ill. May 15, 2020) quoting that in *Redd*, the district court held "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) and that the reasons it has determined in this case constitute extraordinary and compelling reasons warranting a sentence reduction satisfy any requirement for consistency with any applicable policy statement."

- *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020) (considering § 924(c) stacking changes one of several extraordinary and compelling reasons); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *4 (D. Neb. Nov. 14, 2019) ("A reduction in his sentence is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed.").

And

- *United States v. Crowe*, 980 F.3d at 1102 n.6 (holding that inmate's prior exposure to tuberculosis "could be considered an extraordinary and compelling reason for compassionate release" because it "put him at risk of contracting the virus" or "serious long-term health problems" if he had already contracted it). Courts considering the issue post-*Jones* have agreed. See, e.g., *United States v. Rucker*, No. 17-20716, 2020 WL 7240900, at *2 (E.D. Mich. Dec. 9, 2020) (HIV and asthma) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v. White*, No. 18-20183, 2020 WL 7240904, at *3 (E.D. Mich. Dec. 9, 2020) (BMI of 45.9) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v.*

*Crowe*, No. CR 11-20481, 2020 WL 7185648, at *3 (E.D. Mich. Dec. 7, 2020) (latent tuberculosis, hyperlipidemia, obesity).

- Section 1B1.13 has not been updated to reflect pursuant to the 2018 First Step Act, hence, defendants now have the ability to bring such motions directly. This anomaly has given rise to a debate concerning whether and to what extent § 1B1.13 applies to motions filed by defendants, with several circuits recently holding that § 1B1.13 applies only to motions filed by the Bureau of Prisons, and not to motions filed by defendants on their own behalf. See *United States v. McCoy*, Nos. 20-6821, 20-6869, 20-6875, 20-6877, 2020 WL 7050097, at *6-7 (4th Cir. Dec. 2, 2020); *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *8-9 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020); *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).

It is also essential to note that at sentencing, Judge Shapiro complained aloud that a life sentence was too harsh for Martin's March 6, 1998, robbery of $6,694 from the United Bank branch on Girard Avenue near 29th Street. See Exhibit 4. Martin's sentencing guidelines called for a prison term in the 20-year range, and that would have been "more adequate" to cover the bank robbery. *Id.* It's questionable social policy," she said of the three-strike law. The Judge also said it was "wrong" of the law-enforcement authorities to use the federal courts to put Martin away for life for a bank robbery because they "think" the seven years he served for murder was inadequate punishment. *Id.*

Factoring in Martin's advanced age, medical condition, and rehabilitation, his continued risk to the public if released appears to be markedly reduced as recidivism declines with age, particularly when tempered by significant rehabilitation. Martin is now 67 years old, making him substantially less likely to recidivate than a younger offender. According to a report by the U.S. Sentencing Commission, Martin, at 65 years or older, has a recidivism rate of 2.1 percent. See U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 3 (Dec. 2017) (reporting that "recidivism measured by rearrest, reconviction, and reincarceration declined as age increased"

and that offenders aged 65 or older had a rearrest rate of 2.1 percent, as compared to 16.4 percent for offenders younger than 29). To date, he has served 278 months in BOP custody. Given the length of his imprisonment, his personal rehabilitation, and deeply felt remorse, the Court must conclude that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued detention.

Under 18 U.S.C. § 3582(c)(2), to modify Martin's sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Additionally, Martin also contends that evidence of his post-sentencing rehabilitation warrants a reduction. Martin's sentence would result in unwarranted sentencing disparities among similarly situated defendants. More so, his BOP record does not show that he is violent or a threat to public safety. This sentence also avoids unwarranted sentencing disparities.

If granted compassionate release, Martin will reside with his sister, Chris A. Leonard, residing at 321 Hopesway Drive, Dudley, NC 28333– willing to provide Martin with shelter, food and personal services needed upon his release. See Exhibit 4.

Finally, the combination of factors, age, health conditions, COVID-19 risk, as well as length of time already served, post-sentencing rehabilitation, and the changing sentencing landscape justify granting compassionate release to Martin. Else, it would result in unwarranted sentencing disparities among similarly situated defendants. More so, his BOP record does not show that he is violent or a threat to public safety.

## IV. CONCLUSION

For the above and foregoing reasons, Martin prays this Court would consider his Motion for

Compassionate Release/ Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First

Step Act of 2018, based upon the fact that he has exhausted available administrative remedy and he

has met the "extraordinary and compelling reasons" requirement. Martin's has already served a

sentence about 38 months longer than what would be imposed today for the same conduct.

Remaining in prison would only exacerbate the sentencing disparity created by a sentencing practice

which Congress ended with the FSA by clarifying its intent from the beginning. Martin prays that this

Court finds that the § 3553(a) factors weigh in favor of reducing his sentence to time served.

Respectfully submitted,

Dated: June 28, 2021

*Robert Martin*
ROBERT EARL MARTIN
REG. NO. 39869-066
FCI BUTNER MEDIUM II
FEDERAL CORR. INSTITUTION
P.O. BOX 1500
BUTNER, NC  27509
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2021, I mailed a true and correct copy of the above and
foregoing Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. §
3582(c)(1)(A) and the First Step Act of 2018 via U.S. Mail, postage prepaid, to Mary E. Crawley,
Assistant U. S. Attorney at U.S. Attorney's Office, 615 Chestnut Street, Suite 1250, Philadelphia,
PA 19106-4476.

*Robert Martin*
ROBERT EARL MARTIN

**<u>EXHIBIT 1:</u>**
**"Administrative Remedies"**

BP-S148.055  INMATE REQUEST TO STAFF  CDFRM
SEP 98
U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member)  The Warden / Mr. Luc | DATE:  11/13/20 |
|---|---|
| FROM:  Robert Martin | REGISTER NO.:  39869-066 |
| WORK ASSIGNMENT:  Pie | UNIT:  MD - 68L |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.

Pursuant to Program Statement 5050.50, I am Requesting a
Compassionate Release / Reduction in Sentence under 18 u.s.c. 3582
(c)(1)(A)(i) and 4205 (g) I am filing under "Elderly inmate with
Medical condition for Covid-19. I am 66 years old suffering from
chronic obstructive pulmonary disease (copd), asthma, coronary
Artery disease, ischemic cardiomyopathy, if Release I plans to live
with my sister in Dudle, north carolina and work with blind
industry in Raleigh

(Do not write below this line)

DISPOSITION:

see attached


RECEIVED
NOV 18 2020
BY: CMT Ryat

| Signature Staff Member | Date  12-8-20 |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)          This form replaces BP-148.070 dated Oct 86
                                               and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER          SECTION 6



**U.S. Department of Justice**
Federal Bureau of Prisons
*Federal Correctional Complex*
*Federal Correctional Institution II*
*P.O. Box 1500*
*Butner, NC 27509*

DATE:        November 19, 2020

REPLY TO
ATTN OF:   D. Leu, Warden
              FCI Butner II, North Carolina

TO:          MARTIN, Robert Earl
              Register No.: 39869-066

SUBJECT:   Reduction in Sentence-COVID-19

You requested a reduction in sentence (RIS) based on concerns about COVID-19. After careful consideration, your request is denied.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons. BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner. Your request has been evaluated consistent with this general guidance.

The BOP is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates. We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus. However, your concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence. Accordingly, your RIS request is denied at this time.

If you are not satisfied with this response to your request, you may commence an appeal of this decision via the administrative remedy process by submitting your concerns on the appropriate form (BP-9) within 20 days of the receipt of this response.

## EXHIBIT 2:
**"Medical Documents**

39869.066  BTF



**Catheterization Laboratory**

A SERVICE OF DUKE UNIVERSITY HEALTH SYSTEM

Name: MARTIN, ROBERTOPUS E
MRN: D1379219   DOB: 6/14/1954
Gender: Male
Procedure Date: 1/31/2020
Cine:   CSN: 213985071

## Duke Regional Hospital

## Cardiac Catheterization Report

### Indication(s) for Procedure

| ICD Code | Description |
| --- | --- |
| | HF, chronic; Chronic systolic heart failure |
| R06.02 * | Shortness of breath |
| I25.10 | Atherosclerosis of native coronary, no angina |

*Denotes primary indication

### History

65 yo man with a history of ICM, HFrEF s/p ICD, COPD and pSVT referred for right and left heart catheterization in the setting of persistent SOB.

### Procedures

Aortic pressure
Coronary angiogram – left
Coronary angiogram – right
Right heart catheterization
Fick cardiac output
Left heart cath (LV pressure)

### Vascular Access

Right radial artery 6F sheath
   Disposition:  Removed in lab, site sutured and manual compression applied
Right radial artery 6F sheath
   Disposition:  Removed in lab, manual compression applied

### Catheters

Diagnostic:  CATH, MONITOR SWAN GANZ 2LUM 5FRX110CM

### Diagnostic Findings

Coronary arteries
   Dominance:  right
   All coronaries normal (no CAD).

Hemodynamics (mm Hg)
   State:  Baseline
      Ao/BP (asc Ao):  109/67   Mean: 81 mmHg
      LV:  130/7  EDP:  7 mmHg

### Right Heart Catheterization

State:  Baseline
      RA:   5 mmHg (mean)
      RV:  38/ 5  mmHg
      PA:  40/ 17   22 mmHg (mean)
    PCW:  10 mmHg (mean)
      AV O2:   5.3 vol%
Cardiac output:  5.2 L/min
Cardiac index:  2.3 L/min-m²
      PVR:   2.8 Wood units

### Adverse Events

No complications

### Contrast Total

Isovue 370   30   ml

Patient Name: MARTIN, ROBERTOPUS E
MRN: D1379219  Date of Procedure: 1/31/2020   CSN: 213985071

Final Diagnosis

| ICD Code | Description |
|---|---|
|  | HF, chronic; Chronic systolic heart failure |
| R06.02 * | Shortness of breath |
| I25.10 | Atherosclerosis of native coronary, no angina |

*Denotes primary final diagnosis

Impressions
No significant CAD
Calcified LV apex
Normal RV/LV filling pressures
Mild pulmonary hypertension (PVR 2.8 WU) with normal cardiac index (2.3 L/min/m2)

Moderate sedation with IV benadryl, fentanyl, and versed personally supervised by me for a total of more than 20 minutes

No sedation issues
No complications
Minimal blood loss


Absent Aortic stenosis

Recommendations
To holding in stable condition with TR band in place



James Matthew Brennan, M.D.  was personally present as the attending physician throughout the entire procedure.


_____
James Matthew Brennan, M.D.

**Electronically signed by Matthew Brennan, MD   electronically signed by brenn009 on 1/31/2020 12:37:09 PM with status of Final**

Patient Name: MARTIN, ROBERTOPUS  E
MRN: D1379219  Date of Procedure: 1/31/2020  CSN: 213985071

**Patient**
MARTIN, ROBERTOPUS  E
DOB: 6/14/1954 , Age: 65  Gender: Male
Race: Not reported/Declined
MRN: D1379219
Case Accession Number: AA8036722
**Healthcare Facility**
Duke Regional Hospital
Adult Cardiac Catheterization Laboratory
3643 Roxboro Street
Durham, NC 27704
919-470-4000
**Operator**
James Matthew Brennan, M.D.
**Staff**
Richard Sykes, CVT
Michael Anderson, CVT
Janet Morrison, RN
**Care Providers**
Referred by:
Eric S Moore
2609 North Duke Street, Ste. 700
Durham, NC  27704
919-220-5510

**HISTORY AND PHYSICAL DATA**

**Medical History**
Dyslipidemia
Hypertension
Chronic lung disease
CP symptom assessment: Asymptomatic
CSHA Clinical Frailty Scale: 5: Mildly Frail
Prior MI: 01/01/1996
**Indications for Cath Lab Visit**
Stable known CAD
LV dysfunction
**PCI Indications**
CAD (without ischemic sx)
EF 35%   Modality: Echo
**ICD Diagnoses (* indicates primary indication)**
HF, chronic; Chronic systolic heart failure
* R06.02  Shortness of breath
I25.10  Atherosclerosis of native coronary, no angina

**PROCEDURE DETAILS**

**Procedures**
Aortic pressure
Coronary angiogram - left
Coronary angiogram - right
Right heart catheterization
Fick cardiac output
Left heart cath (LV pressure)
**Logistics**

Patient Name: MARTIN, ROBERTOPUS E
MRN: D1379219   Date of Procedure: 1/31/2020   CSN: 213985071

Time arrived in lab: 10:10 AM, from Monitored bed
Timeout performed and patient verified at: 10:33:00 AM
Consent signed: yes
Sedation consent: yes
Time departed from lab: 11:15 AM, to
Final patient condition: Stable

**Baseline Data**
Height: 177.8 cm   Weight: 111. kg   BSA: 2.27 m$^2$

**Vascular Access**
Right radial artery  6F
  Disposition:  Removed in lab, site sutured and manual compression applied
Right radial artery  6F
  Disposition:  Removed in lab, manual compression applied

## DIAGNOSTIC FINDINGS

**Right Heart Catheterization**
State: Baseline
  Assessment state:
    Inspired O2: Room air
    Estimated percent above BMR = 0%
  Hemodynamics (mmHg)

| Site | Systolic | Diastolic | EDP | A | V | Mean |
|---|---|---|---|---|---|---|
| Ao  (asc Ao): | 109 | 67 | | | | 81 |
| LV: | 130 | 7 | 7 | | | |
| RA: | | | | 5 | 5 | 5 |
| RV: | 38 | 5 | 5 | | | |
| PA: | 40 | 17 | | | | 22 |
| PCW: | | | | 10 | 10 | 10 |

  Oximetry

| Site | Hgb (g/dL) | O2 sat (%) |
|---|---|---|
| ASC AO: | 15.0 | 90.0 |
| PA: | 14.0 | 67.0 |
| PA: | 14.0 | 59.0 |

  Calculations

| | | |
|---|---|---|
| O2 consumption: | 274.8 ML O2/min (assumed fick) | EPBF (Qep): 4.4 L/min |
| Mean Hgb: | 14.5 g/dl | |
| AV O2: | 5.3 Vol% | |
| PBF (Qp): | 4.4 L/min | |
| Cardiac output (Qs): | 5.2 L/min | |
| Cardiac Index: | 2.3 L/min/m$^2$ | |
| PVR: | 2.8 wood units | |
| SVR: | 14.7 wood units | |

**Coronary Angiography**
Instruments: CATH, MONITOR SWAN GANZ 2LUM 5FRX110CM

Coronary Anatomy
  Dominance: Right
  All coronaries normal (no CAD).

## Bureau of Prisons
## Health Services
## Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | MARTIN, ROBERT EARL | | | Reg #: | 39869-066 |
| Date of Birth: | 06/14/1954 | Sex: | M | Race: | BLACK |
| Scanned Date: | 02/04/2020 14:36 EST | | | Facility: | BTF |

**Reviewed by Craft, Patrick MD on 02/11/2020 13:36.**

Bureau of Prisons
Health Services
Clinical Encounter - Administrative Note

| Inmate Name: | MARTIN, ROBERT EARL | | | Reg #: | 39869-066 |
|---|---|---|---|---|---|
| Date of Birth: | 06/14/1954 | Sex: M   Race: BLACK | | Facility: | BTF |
| Note Date: | 06/17/2018 11:57 | Provider: Linzau, Jean MD | | Unit: | M01 |

Cosign Note - Clinical Encounter Cosign encounter performed at Health Services.
Administrative Notes:

ADMINISTRATIVE NOTE  1          Provider: Linzau, Jean MD

IM seen and evaluated in urgent care unit. IM Noted to be coughing paroxysmally with dry cough. IM complains of inability lie flat in bed on his back . does better on his stomach.
Denies chills and fever.
Exam comments:
A&O x3 NAD multiple episodes of couhig during exam
VS as recorded.
HEENT Lef eye conjunctival hemorrhage
PERLA
Pharynx appears irritated  and reddened.
Chest symmetrical ICD inplanted left upper chest.
Lungs : diffused wheezes and occasional crackles thruout lung fields.
Heart RRR.
EKG: no acute changes
Ass: Bronchitis/ Pharyngitis
P: Nebs RX
Inhaled steroids
Tylenol #3 tid prn for paroxysmal cough.

Temperature:

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 06/17/2018 | 10:21 BUX | 98.4 | 36.9 | | Cox, E. RN |

Pulse:

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 06/17/2018 | 10:21 BUX | 90 | | | Cox, E. RN |

Respirations:

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 06/17/2018 | 10:21 BUX | 26 | Cox, E. RN |

Blood Pressure:

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 06/17/2018 | 10:21 BUX | 129/80 | | | | Cox, E. RN |

SaO2:

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 06/17/2018 | 10:21 BUX | 98 | Room Air | Cox, E. RN |

New Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | Albuterol Sulfate 0.083% neb solution | 06/17/2018 11:57 | apply Orally  one time x 1 day(s) |

Indication: Bronchitis
Start Now: Yes
Night Stock Rx#:

Bureau of Prisons
Health Services
Clinical Encounter - Administrative Note

| | | | | |
|---|---|---|---|---|
| Inmate Name: | MARTIN, ROBERT EARL | | Reg #: | 39869-066 |
| Date of Birth: | 06/14/1954 | Sex:      M      Race: BLACK | Facility: | BTF |
| Note Date: | 08/17/2018 13:31 | Provider:   Craft, Patrick MD | Unit: | M01 |

Review Note - Report Review encounter performed at Health Services.
Administrative Notes:

   ADMINISTRATIVE NOTE   1          Provider: Craft, Patrick MD

      PFT reviewed.IM had COPD based on FEV1/FVC of 48% (normal 70%). It is stage 3 by 30%< n=38% <50%.

      Also asthma confirmed with change in FEV1 of 280 cc and 24% with bronchodilator (diagnostic is change of 200 cc and 12% )

      Both FRC and RV increased as seen in emphysema.

      Will begin Spiriva and Asmanex to use daily.

      Will send to PA to d/w inmate.


ASSESSMENTS:

   Chronic obstructive pulmonary disease [COPD], J449 - Current

New Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | Tiotropium Bromide Inhalation Cap | 08/17/2018 13:31 | 1 puff Orally  -  Two Times a Day x 180 day(s) |

               Indication: Chronic obstructive pulmonary disease [COPD]

Renew Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| 1415894-BUX | Mometasone Furoate Inhal 220 MCG/Inh ( 30 doses) | 08/17/2018 13:31 | inhale 1 puff twice daily for 3 days shake well ***pill line*** x 180 day(s) Pill Line Only |

            Indication: Cough, Bronchitis

Copay Required: No            Cosign Required:  No
Telephone/Verbal Order:  No

Completed by Craft, Patrick MD on 08/17/2018 13:56
Requested to be reviewed by  Lecuire, Pascale PA-C.
Review documentation will be displayed on the following page.

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | MARTIN, ROBERT EARL | | | Reg #: | 39869-066 |
| Date of Birth: | 06/14/1954 | Sex: | M   Race: BLACK | Facility: | BTF |
| Encounter Date: | 08/21/2018 10:04 | Provider: | Craft, Patrick MD | Unit: | M01 |

Physician – Follow up Visit encounter at Health Services.

**Reason Not Done:**  No Show

**Comments:** follow up on c/o unproductive cough and new diagnosis COPD. IM needs Spiriva +/- steroid. Not in WR at callout time.

**Cosign Required:** No

Completed by Craft, Patrick MD on 08/21/2018 10:05.

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name:  MARTIN, ROBERT EARL | | Reg #: | 39869-066 |
| Date of Birth:  06/14/1954 | Sex:  M  Race:  BLACK | Facility: | BTF |
| Encounter Date:  08/21/2018 10:45 | Provider:  Craft, Patrick MD | Unit: | M01 |

**Status:** In Progress

Physician - Follow up Visit encounter performed at Health Services.

**SUBJECTIVE:**

**OBJECTIVE:**

**ASSESSMENT:**

**PLAN:**


Copay Required: No                    Cosign Required:  No

Telephone/Verbal Order:  No

**CONSULTATION REPORT**

**U.S. DEPARTMENT OF JUSTICE**          **FEDERAL BUREAU OF PRISONS**

| Name: Martin, Robert Earl | |
|---|---|
| Reg. #: 39869-066 | Referred By: BUTNER FCI |
| DOB: 06/14/1954 | Attending: MOORE, ERIC |

| CHIEF COMPLAINT: Coronary artery disease. | | |
|---|---|---|
| Date of Visit: 01/05/2016 | Dictation Received: 01/05/2016 | Dictation Transcribed: 01/05/2016 |

**Sensitive but Unclassified**

## CONSULTATION

**HISTORY OF PRESENT ILLNESS:** Mr. Martin has a history of ischemic cardiomyopathy. He had an MI, apparently in the mid 1990s. I do not have a cath report, but most recent echocardiogram was done in 11/2015, that was consistent with LAD territory infarction with an ejection fraction of about 25%. He also had a mild pulmonary hypertension at that point in time.

He also has a history of dysrhythmia. He has a defibrillator in place for what was termed runs of nonsustained ventricular tachycardia. After placing the defibrillator, he was shocked 30-40 times for what appeared to be supraventricular tachycardia. The settings on his pacemaker were changed and he has not been shocked since, but the pacemaker continues to show bursts of SVT. He has received antitachycardia pacing for these bursts of SVT, though it has not progressed to the point where he has gotten shocked.

He reports problems with exertional dyspnea. This has been ongoing for some time. Additionally, he gets short of breath when he lies on his stomach, but not when he lies on his back. He does not have any significant edema. He denies orthopnea.

Of note, he does have a mediastinal mass. It has been poorly characterized from reports available. Most recent imaging was from 10/2014 and suggested it was about 6 cm x 3 cm with possible mass effect on the left ventricle. It had been stable in size and did not appear malignant on PET scanning, but it has not been more fully characterized. He has also had problems with H. pylori in the past. He is on Coumadin for prevention of LV thrombus, given an apical aneurysm. However, he has never been on aspirin due to problems with stomach upset from H. pylori in the past.

All these problems are chronic. There do not seem to be any acute changes.

**PHYSICAL EXAMINATION:** Temperature is 96.2 degrees Fahrenheit, blood pressure 120/82, pulse 63, respiratory rate 16, oxygen saturations 98%. HEENT: Pupils are equal and round. Extraocular movements are intact. Oropharynx is clear with moist mucous membranes. Neck: No JVD or bruit bilaterally. Cardiovascular: He has got a regular rate and rhythm with S1 and S2. No murmurs, rubs, or gallops. Lungs: Clear to auscultation bilaterally. Extremities: No clubbing, cyanosis, or edema.

**IMPRESSION:**
1. Coronary artery disease. He does have a history of coronary disease. His most recent LDL was 145, but he admits he was not on a statin medication at that time. He has since restarted taking atorvastatin 80 mg daily. He needs to have his LDL rechecked to see if this needs to be titrated. He is not currently on aspirin. That is currently appropriate, as he needs to have a GI evaluation for H. pylori. I would recommend he follow up with GI, both for his H. Pylori and for a hernia to see if it needs to be repaired. I would like GI to clear him for aspirin therapy if possible.
2. Congestive heart failure. He has systolic heart failure. He has a defibrillator in place, which is appropriate for primary prevention. He appears euvolemic. He is on beta-blocker and ACE inhibitor. No medication changes are necessary for this.
3. Episodes of SVT. He is not being shocked for his episodes of SVT, but I do not know if they have been fully evaluated. I would recommend an EP consult to see if SVT is something that can be treated more aggressively, either through antiarrhythmic medications or through ablation.
4. Mediastinal mass. He has a mild symptom of shortness of breath, which is worse when he is laying on his stomach. He has

*BTF*

Page 2 of 2
**Name:**   Martin, Robert Earl

got a poorly characterized mediastinal mass.  I do worry about mass-effect on the heart from the mass in his mediastinum. This does need to be more fully evaluated.  The most efficient way to evaluate this is likely be a cardiac MRI, which need to be performed at Duke.  That would give an opportunity to more fully characterize the mass and see if there is any kind of mass effect on the heart that contributes to his symptom complex.

Signature:

    Eric Moore, MD

EM
*Electronically Signed 01/06/2016 11:16*

*Job No: 244844*

## RADIOLOGIC REPORT

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| Patient Identification:<br>Name, Reg #, Date of Birth, Institution<br><br>**MARTIN, ROBERT EARL**<br>**Reg. #:**   39869-066<br>**DOB**:   06/14/1954<br>**FCI2** | Unit:  FCI2<br><br>Requested By:<br>Patrick Craft, MD | Exam(s) Requested:<br><br>CT - Chest/Abdomen/Pelvis With<br>Contrast. |
|---|---|---|
| Reasons for Study/Provisional Diagnosis as per Referring Clinician *[per request form]*.<br>Chest mass and pancreatic lesion. | | |

| Date of Study:<br>02/19/2014 | Date of Dictation:<br>02/19/2014 | Dictation Received:<br>02/19/2014 | Dictation Transcribed:<br>02/20/2014 |
|---|---|---|---|

### Sensitive but Unclassified

**TECHNIQUE:** Multiphasic imaging of the pancreas.  75 mL Isovue-320 intravenously.  Contrast dose reduced for creatinine 1.5, GFR 56.  Oral contrast.

**CONTRAST:** 75 mL Isovue-320 intravenously.

**COMPARISON:** Terre Haute FCC CT abdomen and chest dated 09/22/2011, but images are not available for direct comparison.

**FINDINGS:**
Chest CT - Imaged portions of the distal trachea, as well as right and left mainstem bronchi are patent. There are numerous areas of focal lucency distributed throughout the lungs, though more prominently in the lung bases.  On some views, there is suggestion of slight wall thickening raising the question of cystic lung disease, although bullae are more common.  Bilateral pulmonary densities consistent with scarring and/or atelectasis are noted, this is most prominent in the right middle lobe inferiorly.

A mediastinal mass is present, interposed between the posterior wall of the left atrium and the anterior aspect of the spine.  The mass is in broad contact with the thoracic esophagus, although there is no esophageal dilatation identified above this level.  The mass abuts the azygos vein and the posteroinferior aspect of the right hilum.  Mass measures approximately 4.9 cm AP x 5.6 cm transverse.  This is of concern for neoplasm.  It is also in broad contact with the inferior surface of the carina and both proximal mainstem bronchi.

Elsewhere, no mediastinal or hilar adenopathy identified.  Small nodes are present in the axilla.

A small hiatal hernia is present.

Abdomen CT - Pre-contrast images demonstrate no abnormal calcification within the pancreas.  A mass is present immediately adjacent to the anterior, inferior aspect of the pancreatic head and appears in

| Signature:<br><br>*S B*<br>SAMUEL N. BONE, III, M.D. | Location of Radiologic Facility:<br>Butner |
|---|---|

Job No: 467281   MT: 0951

**CONSULTATION REPORT**

**U.S. DEPARTMENT OF JUSTICE**          **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| **Name:**   Martin, Robert Earl<br>**Reg. #:**   39869-066<br>**DOB:**      06/14/1954 | **Referred By:** BUTNER FCI<br>**Attending:** MOORE, ERIC |

| CHIEF COMPLAINT: Coronary artery disease. | | |
|---|---|---|
| Date of Visit:<br>01/05/2016 | Dictation Received:<br>01/05/2016 | Dictation Transcribed:<br>01/05/2016 |

**Sensitive but Unclassified**

## CONSULTATION

**HISTORY OF PRESENT ILLNESS:** Mr. Martin has a history of ischemic cardiomyopathy. He had an MI, apparently in the mid 1990s. I do not have a cath report, but most recent echocardiogram was done in 11/2015, that was consistent with LAD territory infarction with an ejection fraction of about 25%. He also had a mild pulmonary hypertension at that point in time.

He also has a history of dysrhythmia. He has a defibrillator in place for what was termed runs of nonsustained ventricular tachycardia. After placing the defibrillator, he was shocked 30-40 times for what appeared to be supraventricular tachycardia. The settings on his pacemaker were changed and he has not been shocked since, but the pacemaker continues to show bursts of SVT. He has received antitachycardia pacing for these bursts of SVT, though it has not progressed to the point where he has gotten shocked.

He reports problems with exertional dyspnea. This has been ongoing for some time. Additionally, he gets short of breath when he lies on his stomach, but not when he lies on his back. He does not have any significant edema. He denies orthopnea.

Of note, he does have a mediastinal mass. It has been poorly characterized from reports available. Most recent imaging was from 10/2014 and suggested it was about 6 cm x 3 cm with possible mass effect on the left ventricle. It had been stable in size and did not appear malignant on PET scanning, but it has not been more fully characterized. He has also had problems with H. pylori in the past. He is on Coumadin for prevention of LV thrombus, given an apical aneurysm. However, he has never been on aspirin due to problems with stomach upset from H. pylori in the past.

All these problems are chronic. There do not seem to be any acute changes.

**PHYSICAL EXAMINATION:** Temperature is 96.2 degrees Fahrenheit, blood pressure 120/82, pulse 63, respiratory rate 18, oxygen saturations 98%. HEENT: Pupils are equal and round. Extraocular movements are intact. Oropharynx is clear with moist mucous membranes. Neck: No JVD or bruit bilaterally. Cardiovascular: He has got a regular rate and rhythm with S1 and S2. No murmurs, rubs, or gallops. Lungs: Clear to auscultation bilaterally. Extremities: No clubbing, cyanosis, or edema.

**IMPRESSION:**
1.   Coronary artery disease. He does have a history of coronary disease. His most recent LDL was 145, but he admits he was not on a statin medication at that time. He has since restarted taking atorvastatin 80 mg daily. He needs to have his LDL rechecked to see if this needs to be titrated. He is not currently on aspirin. That is currently appropriate, as he needs to have a GI evaluation for H. pylori. I would recommend he follow up with GI, both for his H. Pylori and for a hernia to see if it needs to be repaired. I would like GI to clear him for aspirin therapy if possible.
2.   Congestive heart failure. He has systolic heart failure. He has a defibrillator in place, which is appropriate for primary prevention. He appears euvolemic. He is on beta-blocker and ACE inhibitor. No medication changes are necessary for this.
3.   Episodes of SVT. He is not being shocked for his episodes of SVT, but I do not know if they have been fully evaluated. I would recommend an EP consult to see if SVT is something that can be treated more aggressively, either through antiarrhythmic medications or through ablation.
4.   Mediastinal mass. He has a mild symptom of shortness of breath, which is worse when he is laying on his stomach. He has

*BTF*

**EXHIBIT 3:**
**"News Article: Judge Norma L. Shapiro's Opinion at Sentencing"**

To:Whom it may concern.Please,I need your help to prove my innocence of arm bank robbery.Criminal No:98-178.

I was wrongly accused of robbing a bank on March 6th,1998 in philadelphia. However,I was signaled out by the Federal Government,"to revenge an acccdental homicide of a white female dating back to 1973".

The revenge became apparent when the Government referred to the O.J.simpson case in her opening argument,using the "glove scenario".I knew right then that i would not get a fair trial.

The evidence in this case consisted of reportedly clear bank surveillance photographs,and three eye witnesses.An expert for the defense testified that he could not make a positive identification,based on the surveillance photographs,and my arresting photograph.

As well,The Court ruled that the eyewitnesses identification of the robber was equivcal.

To get this conviction,The Government misrepresented the evidence,and vouched for the witness credibility,"without any objection by ny trial counsel".

In the Government closing argument,She assured the Jury that the photographic expert did infact make a positive identification,coupled with those facts,My own trial counsel lid serious harm to my case when he 'elicit from a Police Detective an mpermissible identification,and then licit an inadmissible out-of-Court dentification from the same Police etective of a none testifying witness hat sealed the deal for the prosecution.

It is reasonable question as to hether or not,The constituents of the overnment followed suit throughout my rial,as well as all of my appeals

or more information,contact me at:

Mr.Robert Earl Martin #39869-066



/ou for your appreciated concern.

# He gets life term for 'third strike'

By JIM SMITH
smithjim@phillynews.com

A 1998 conviction for an armed bank robbery was Robert Earl Martin's third "strike," coming 10 years after an earlier armed bank robbery, and nearly 25 years after a barroom murder.

So U.S. District Judge Norma L. Shapiro had no choice yesterday but to imprison Martin, 46, for life.

Under a federal "three strike" law passed in 1994, a defendant convicted of "a serious violent felony" must be sentenced to life in prison if he or she has two prior "strikes" — that is, convictions for violent crimes.

Martin committed all three crimes with a shotgun, police said.

The judge complained aloud that a life sentence was too harsh for Martin's March 6, 1998, robbery of $6,694 from the United Bank branch on Girard Avenue near 29th Street.

During the robbery Martin placed his shotgun to the head of a security guard and forced her into the teller area, where he grabbed the money and fled.

Bank employees and customers may have been "terrified" by the shotgun-wielding robber "but no one was hurt fortunately," the judge added.

Sentencing guidelines called for a prison term in the 20-year range, and that would have been "more than adequate" to cover the bank robbery, Shapiro said.

"It's questionable social policy," she said of the three-strike law.

The judge also said it was "wrong" of law-enforcement authorities to use the federal courts to put Martin away for life for a bank robbery because they "think" the seven years he served

See LIFE Page 29



Robert Martin: Bank robberies

## LIFE
Continued from Page 27

for murder was inadequate punishment.

"You didn't like the state sentence [for the murder]," the judge said to Assistant U.S. Attorney Mary Crawley.

The judge's words did little to console the defendant, who denied committing the 1998 bank robbery despite his identification by three eyewitnesses and bank surveillance photographs of him carrying a shotgun inside the bank that day.

Martin, a barber, complained that he was being put in jail for the rest of his life "to revenge" the 1973 murder of 22-year old Diane Miller inside a bar on 2nd Street near Lehigh Avenue.

Then 18-years old, he'd gone to the bar looking to shoot someone else and shot her by accident when someone hit his shotgun with a barstool, Martin told the judge.

"I didn't commit that murder purposefully," Martin complained.

The victim's husband was in court yesterday but declined to speak afterwards.

Martin's second strike was a 1988 conviction for robbing a bank in Goldsboro, N.C., that led to an eight-year prison term.

Defense attorney Jeff said Martin would app

**EXHIBIT 4:**
**"Affidavit of Responsibility"**

Dear Judge Kearney

My name is Chris A Leonard, and I am the sister of Mr. Robert Earl martin. I never had to write to a Judge before, but I am writing to you because I understand that my brother filed a Motion Requesting a Compassionate Release because of his Medical condition and the Covid- 19. Robert Earl Martinis a good brother, A good man and a good father to his children. he asks them every time he calls me My mother Rose L Martin had 9 children and she had to rise us up all by herself.

Our father passed away when we were little, and our baby brother was 6 months old. I am asking you to please do not let my brother die in prison. I know he has learned his lesson after all the time he has spent in prison. I know he do not want to go back anymore, and he knows that he will go back if he does not do what is right. Robert Earl has 6 children's that has their own children's which is his grand children's and has some grate grandchildren's that he never seen as well. And some nieces and nephews and their children's he has not never seen. Judge Kearney Please have mercy on my brother and let the Martin family have him back so we can enjoy what time he has left, and all our children can get to know him. We can get him to a good doctor's so he can get him better.

My brother Earl is sick .and I am overly concerned about the sickness he has now with all this Covid- 19 going on. Judge Kearney my brother Robert Earl is not a danger person to anyone out here he cannot get around good anymore. When he goes to the doctor, I will be right there are one of our brothers. Please give my brother another chance for the last time. I am praying for him to get another chance that God Almighty will help bring my brother back home. He will be living with me his sister Chris A Leonard at my home at 321 Hopesway Drive, Dudley North Carolina, 28333. I have been living here since 1990. I own my home.

Sincerely,

Mrs. Chris A. Leonard *(Chris M. Leonard)*                    15 Dec 2020

Wayne County, North Carolina
I certify that the following person personally appeared before me this day, Acknowledging to me that she signed the forgoing document: Judge Kearney.

Donald E. Frisco
Donald E. Frisco — Notary Public
My commission expires 4 June 2021

October 19, 2020

To Whom Concerned:

I am writing this letter on behalf of my brother, Robert Earl Martin, 39869-066. I am Ricky Lee Martin. I want to tell you a little bit about our family history. We were raised by our mother alone after our father died when I was six months old. Our mother did the best she knew how to raise nine children alone. We were a close family, and our oldest brother George (Jack) Battle had to quit school in the 3rd grade to help her support the family. As we became old enough, we had to work in tobacco, bean fields, potatoes, and cucumber fields to help her also.

Robert Earl is the 5th child, and he was not a troubled child, but when he came of age, he moved to Philadelphia with a cousin. He was doing well until he started using drugs, and his life changed.

I believe that Robert Earl has reached a point in life that he knows that he needs to return to the values that our mother taught us. Over these last years, he values life now, where he has settled down, and that type of experience of using drugs is over.

I do not believe he will return to a troubled life with his medical condition at this point.

Thank you,

Ricky L. Martin

370 Hopesway Dr.

Dudley, NC 28333

Oct. 24, 2020

To Whom it May Concern

I am writting this letter on behalf of my Brother Robert Earl Martin. I understand that he has filed a motion of requesting a Compassionate release due to his medical issues and possibility of his death if he Contracted Covid-19. I understant that my brother was denied Compassionate release because the probector felt that he would be a danger to others and the communitie. I know that he did wrong and he do to. But my brother is now 66 year old and he know better now. He looks back on his life now and tho thing the he had done and he is very sorry for it. He was very young back then. He is asking for your foregiving for what he had done as well as me and my family. Please let my brother come home to his loveing family and other loveone. We use to could go see him but now we can't because of Covid-19. I love my brother

and I want to see him face to face
and talk to him. A phone call is ok,
but not like see him and looking into
his eyes. He was a good father to his kids
and he can be again. As for him have some
were to stay, He got that. We as a
family will make sure that he will
have that, make sure that he do what
he need to do, and stay on the right
track. I know that the prosecutor felt
like he would be a danger to community
but I don't. He have learn form his
misstake and he apologize from the
button of his heart and I do to.
So please can you look into yours and
let my brother come home and be
with his family for the rest of his life.

Yours Respectfully

David M. Martin

Your Honor,

I am writing in support of Robert Earl Martin. Robert and I have been aquainted since we were 16 yrs. old.

He has always been kind and sensitive. He has never been a violent person. He and I plan to be married soon. I pray you find it to be able to help him. He has been incarserated for a long time now. I understand that he alowed himself to get involved with unsavory characters which caused him to be where he is now.

Robert had a very hard upbringing in a one parent Household. His Mother was a troubled person, who did the best she could with a house full of children. Unfortunately he was involved with doing drugs, which led him to doing things he would not otherwise be involved in.

I appreciate you taking time to read my letter, and I hope you take into consideration that we all make mistakes in life. May God bless you and your family.

Sincerely,
Karie Spencer, Carter

Hey Love,
    I hope this letter helps
you to please your Case, I love
you so much, and I pray that
God puts it in his heart to
be lenient towards you, I
will wait for you no matter
how long.
    But hopefully it won't be
much longer. With all the
blessing God has for us we
will be together soon

            Always loving you
                Lois.

Robert Earl Martin
#39869-066
Federal Correctional institution #2
P.O. Box 1500
Butner N.C. 27509

Ms. Kate Bachman (Clerk of Court)
U.S. District Court, For the Eastern
District of Pennsylvania
601 Market Street, Room 2609
Philadelphia. PA 19106-1729

U.S.M.S.
X-RAY



FEDERAL CORRECTIONAL INST. #2
P.O. BOX 1500
BUTNER, NORTH CAROLINA 27509

DATE:  6-28-21

"SPECIAL/LEGAL MAIL"

The enclosed letter was processed through special mailing
procedures for forwarding to you. The letter has been
neither opened or inspected. If the writer raises a question
or problem over which this facility has jurisdiction, you
may wish to return the material for further information
or clarification. If the writer enclosed correspondence for
forwarding to another addressee, please return the enclosed
to the above address.



RECEIVED

JUL - 6 2021